Steve ROBINSON *v.* STATE OF Arkansas

CR 02-915                                          108 S.W.3d 622

Supreme Court of Arkansas
Opinion delivered May 29, 2003

374

*John W. Cone*, for appellant.

*Mike Bebee*, Att'y Gen., by: *Clayton K. Hodges*, Ass't Att'y Gen., for appellee.

Tom Glaze, Justice. Steve Robinson was charged with first-degree murder, being a felon in possession of a firearm, and abuse of a corpse after police questioned him in the disappearance of Peggy Burns. Burns, who was Robinson's step-sister,[1] had not been heard from since November of 2000, shortly after she moved in with Robinson and his wife, Shirley. Although Robinson initially denied knowing anything about her disappear-

---

[1] Burns's father married Robinson's mother.

ance, he eventually claimed to the police that he had shot her in self-defense and then burned her body in a burn pit behind his house outside of Dumas. Robinson was tried in March of 2002, and the jury convicted him on all three charges; he was sentenced to life in prison on the murder conviction, thirty years on the felon-in-possession conviction, and twelve years for abuse of a corpse. From these convictions, Robinson brings the instant appeal, arguing that there was insufficient evidence to support his first-degree murder conviction, and that the trial court erred in allowing certain testimony during the State's rebuttal case. We find no error, and affirm.

Robinson's first point on appeal challenges the sufficiency of the evidence supporting his conviction. Before discussing the merits of this argument, however, we first point out that there was some confusion as to the state of the record surrounding Robinson's motion for directed verdict. After the State rested, the transcript indicates that defense counsel asked for "a short recess in order to take up motions." The court recessed for about ten minutes, and when court reconvened, counsel began presenting the defense's case-in-chief. At the conclusion of Robinson's case, the following colloquy occurred between the court and Maxie Kizer, Robinson's defense counsel:

MR. KIZER: May we approach the bench, please?

COURT: You may.

[Counsel approached the bench]

MR. KIZER: I would like the record to reflect that motions were made.

COURT: At the conclusion, I'll recite them that at the end of the State's case and you, again, renewed them at the conclusion of the defendant's case.

After the jury retired to deliberate on Robinson's guilt or innocence, the court made the following announcement:

Let the record reflect that the defendant, through his counsel, at the conclusion of the State's case moved the court for a directed verdict on [the] murder charge. Or at least murder in the first degree. The court denied that motion. It was again renewed at the conclusion of the defendant's case. These

motions were made in chambers with the court and all parties present. It is now being put on the record. Anything you want to add to that, Mr. Kizer?'

Mr. Kizer responded as follows:

> I do, your Honor. My name is Maxie Kizer, attorney for the defendant. In chambers at the conclusion of the State's case, specifically with regard to the charge of murder in the first degree, I asked the court for a directed verdict, that there was not a prima facie [case] or prima facie evidence submitted to this case for the jury on that charge. And that purposeful conduct had not been proven. I also made the same argument with regard to the defense [sic] of felon in possession of a firearm. And it was the same grounds that I renewed my motions at the conclusion of the State's case and at the conclusion of rebuttal. The record would so reflect, your Honor.

The State voiced no objection to the directed-verdict motions being handled in this manner. However, in its brief on appeal, the State adds a footnote to the effect that it "does not concede that the sufficiency challenge is preserved for appellate review because the record does not indicate that the motions were made at the appropriate time." However, the State also notes that the trial court stated that motions were made at the appropriate times, and defense counsel did state on the record his grounds for his directed-verdict motion.

■ ■ This court's Administrative Order No. 4 requires a complete record of all proceedings. The order provides that, "[u]nless waived on the record by the parties, it shall be the duty of the circuit court to require that a verbatim record be made of all proceedings pertaining to any contested matter before it." (Emphasis added.) See also Ark. Code Ann. § 16-13-510 (Repl. 1999) (requiring complete record of the proceedings in all cases). Because the State and the defense did not waive their right to a verbatim record in accordance with Administrative Rule No. 4, the trial court's failure to make a verbatim record of the in-chambers conferences on the directed-verdict motion was error. See Smith v. State, 324 Ark. 74, 918 S.W.2d 714 (1996). Although the State voiced no objection to the trial court's handling of the directed-verdict motion in this manner, we will not construe the State's silence on this issue

at trial as implying a waiver of this requirement. *See Mattocks v. Mattocks*, 66 Ark. App. 77, 986 S.W.2d 890 (1999).

■ ■ Ark. R. Crim. P. 33.1(a) requires a defendant to make a motion for directed verdict at the close of the evidence offered by the prosecution and at the close of all the evidence; the motion must recite the specific grounds in support of the requested directed verdict. Further, the failure of a defendant to challenge the sufficiency of the evidence at the times and in the manner required will constitute a waiver of any question pertaining to the sufficiency of the evidence to support the verdict. Ark. R. Crim. P. 33.1(c). Obviously, it puts this court at a considerable disadvantage in reviewing points on appeal pertaining to unrecorded hearings or orders, when a verbatim record is not before us. *See Norman v. State*, 339 Ark. 54, 2 S.W.3d 771 (1999); *Allen v. Burton*, 311 Ark. 253, 843 S.W.2d 821 (1992). While this court realizes that there may be some confusion by some counsel and judges who believe they may routinely avoid verbatim records on motions or objections by holding one hearing at the conclusion of the trial, that belief ignores rules such as Rule 33.1, which requires the party to specify his or her grounds at designated stages of the trial. We take this opportunity to put the bench and bar on notice that, henceforth, this court will strictly construe and apply Administrative Order No. 4, and require that all motions for directed verdict be conducted on the record at the times such motions are mandated. Under Administrative Order No. 4, unless the parties agree otherwise, it the duty of the circuit court to require a verbatim record in any contested proceeding before it. The court's duty in these circumstances does not alleviate the moving parties' responsibility to make a timely motion.

■ We turn now to the merits of Robinson's first point on appeal. This court has repeatedly held that in reviewing a challenge to the sufficiency of the evidence, we view the evidence in a light most favorable to the State and consider only the evidence that supports the verdict. *Fairchild v. State*, 349 Ark. 147, 76 S.W.3d 884 (2002); *Wilson v. State*, 332 Ark. 7, 962 S.W.2d 805 (1998). We affirm a conviction if substantial evidence exists to support it. *Carmichael v. State*, 340 Ark. 598, 12 S.W.3d 225 (2000). Substantial evidence is that which is of sufficient force and

character that it will, with reasonable certainty, compel a conclusion one way or the other, without having to resort to speculation or conjecture. *Id.* Circumstantial evidence may provide the basis to support a conviction, but it must be consistent with the defendant's guilt and inconsistent with any other reasonable conclusion. *Bangs v. State*, 338 Ark. 515, 998 S.W.2d 738 (1999).

To sustain a conviction for first-degree murder, the State was required to prove that Robinson purposely caused the death of Peggy Burns. See Ark. Code Ann. § 5-10-102(a)(2) (Repl. 1997). "A person acts purposely with respect to his conduct or a result thereof when it is his conscious object to engage in conduct of that nature or to cause such a result[.]" Ark. Code Ann. § 5-2-202(1) (Repl. 1997). A criminal defendant's intent or state of mind is seldom capable of proof by direct evidence and must usually be inferred from the circumstances of the crime. *Edmond v. State*, 351 Ark. 495, 95 S.W.3d 789 (2003); *Smith v. State*, 337 Ark. 239, 988 S.W.2d 492 (1999). Thus, this court has recognized that the intent necessary to sustain a conviction for first-degree murder may be inferred from the type of weapon used, the manner of its use, and the nature, extent, and location of the wounds. *Sanders v. State*, 340 Ark. 163, 8 S.W.3d 520 (2000). This court has held that guilt can be established without eyewitness testimony and evidence of guilt is not less because it is circumstantial. *Ross v. State*, 346 Ark. 225, 57 S.W.3d 152 (2001); *Gregory v. State*, 341 Ark. 243, 15 S.W.3d 690 (2000).

Reviewing the evidence in the light most favorable to the State, the proof adduced at trial revealed the following. Peggy Burns was Steve Robinson's step-sister. Burns had a nursing license, but had been out of work for some time prior to the fall of 2000. In September and October of 2000, Burns had been living at a friend's house in Pine Bluff, but she moved in with Robinson and his wife, Shirley, sometime toward the end of October. Burns's daughter, Amy Robertson, last heard from her mother on October 31, 2000. When Burns did not show up for Christmas, New Year's, or her father's funeral, her family contacted the police.

Arkansas State Police Investigator Roger McLemore began to investigate Burns's disappearance. In December of 2000, McLe-

more went to visit with Robinson about Burns. Robinson informed McLemore that Burns had left his house on the morning of November 8, 2000, driving off in a small red pick-up truck with an unknown driver. Robinson indicated that Burns might be in Florida, but also suggested that she had a passport and might have gone to Australia. The State Police sent out letters to law enforcement agencies across the country, searching for information about Burns, but discovered nothing.

On March 15, 2001, McLemore called Robinson and asked him to come to Pine Bluff to speak with McLemore about Burns again. Robinson stuck to his story that he knew nothing about her whereabouts, but added that he and Burns had "argued a little bit over the car." According to Robinson, Burns had asked to use his car several times, but he would not let her use it, because she did not have a driver's license.

In early May of 2001, McLemore interviewed both Steve and Shirley Robinson. Steve Robinson continued to deny any knowledge of Burns's disappearance, but Shirley provided information that caused McLemore to feel that he had probable cause to arrest Robinson. At that time, McLemore arrested Robinson, and interviewed him again. Robinson gave the following version of events, implicating himself in Burns's death.

On November 7, 2000, Burns was trying to find drugs, and the Robinsons drove her around town. After a while, Robinson decided to return home, and Burns became "very agitated." She left the Robinson house and walked down the road to the church, apparently to use the phone. When she returned, she demanded to use Robinson's car. Robinson refused, and shortly thereafter, he heard Burns cock a rifle. When he turned around, Burns was pointing the gun at him. He tossed his car keys at her, and "grabbed the end of the rifle and we both struggled over that rifle for a second. I tried to snatch it away from her and it went off. The bullet hit her . . . at the top of her head." After reassuring his wife that nothing had happened, Robinson dragged Burns's body to the back yard, and then went back in and mopped up the kitchen floor. He then carried her body out to a burn pit behind the house and "halfway buried her." A few days later, worrying

that animals might dig up the body, he wrapped the body in a sheet, put it inside some tires, doused the whole thing with diesel fuel, and set it all on fire. Robinson also burned Burns's bed, her pillow, and all her clothes and belongings, including her suitcase and her identification. Robinson claimed he did not go to the police because he felt that no one would believe him, due to his criminal record.

When law enforcement officers went to excavate the burn pit behind Robinson's house, they retrieved one small piece of bone and a few personal items, such as jewelry and eyeglasses, which Burns's daughter later identified as belonging to her mother. At trial, McLemore opined that Robinson's statement was not entirely consistent with the physical evidence recovered from the crime scene. He noted that blood found under the linoleum in the kitchen was not consistent with where Robinson had said the struggle over the rifle took place. Further, if Burns had been shot where Robinson claimed, then Shirley Robinson could have easily seen blood or Burns's body when she came out of the bedroom to see what was happening, but she did not. McLemore also suggested that, although Robinson claimed he never touched the trigger, Burns's arms were not long enough to have turned the gun around, had it pointed upward toward herself, and have pulled the trigger. In addition, McLemore noted that there had been blood on the ceiling on the far end of the kitchen, as well as on a bed that had been in that room; however, Robinson had claimed that Burns had been shot in the doorway inside the living room, which opened off the other end of the kitchen.

The jury found Robinson guilty of first-degree murder. Clearly, the jury disbelieved Robinson's description of the events as accidental; the trier of fact is free to believe all or part of any witness's testimony and may resolve questions of conflicting testimony and inconsistent evidence. *See Turner v. State*, 349 Ark. 715, 80 S.W.3d 382 (2002); *Phillips v. State*, 344 Ark. 453, 40 S.W.3d 778 (2001). In addition, the jury was free to consider Robinson's repeated lies to authorities and his changing stories about his knowledge of Burns's whereabouts. *See Edmond, supra* (a jury need not lay aside its common sense in evaluating the ordinary affairs of life, and it may infer a defendant's guilt from improbable explanations of

incriminating conduct); *see also Branscum v. State*, 345 Ark. 21, 43 S.W.3d 148 (2001); *Hussey v. State*, 332 Ark. 552, 966 S.W.2d 261 (1998). Finally, the jury could have considered the fact that Robinson burned not only Burns's body, but all of her personal belongings, in an attempt to cover up his involvement in the crime; such proof is further evidence of a purposeful state of mind. *See Leaks v. State*, 345 Ark. 182, 45 S.W.2d 363 (2001). We hold that there clearly was substantial evidence to support the jury's conclusion that Robinson was guilty of first-degree murder.

Robinson's second point on appeal is that the trial court erred in allowing the State to present the testimony of Investigator Scott Woodward during its rebuttal case. Woodward investigated the crime scene, and asserted that he had previously worked on ten-to-fifteen homicides in the past year involving gunshot wounds to the head. The State asked Woodward what had been his experience in murder investigations regarding the loss of blood from head wounds. Robinson objected, arguing that Woodward was not qualified to give that kind of testimony, and that it was not relevant. The State responded that Robinson himself had testified that there had been a lot of blood. The court overruled the objection, and Woodward testified that there is usually very little blood loss, because a shot to the head generally results in instant death, and the heart stops pumping. Unless a large caliber weapon was used, Woodward stated, he had "seen as little as a small, small drop of blood just trickling down the side of the head at the entrance wound."

On appeal, Robinson argues that Woodward did not have the background to qualify as an expert witness who would be able to offer this kind of testimony. He contends that, by allowing this testimony, the "State used a totally unqualified witness to brand the defendant's testimony as untruthful when he said [Burns] had bled extensively from her wound." Because the case against him "hung on the jury's interpretation of circumstantial evidence and its weighing of the credibility of the witnesses," Robinson asserts that the trial court's decision to allow this testimony was extremely prejudicial.

■ However, we need not address the propriety of the trial court's admitting Woodward's testimony as an expert, because the State never offered Woodward as an expert, and he was never qualified as one. If a witness is not testifying as an expert, his testimony in the form of opinions and inferences is limited to those opinions or inferences which are rationally based on the perception of the witness, and helpful to a clear understanding of his testimony or the determination of a fact in issue. Ark. R. Evid. 701. Here, Woodward was called upon to offer testimony based on his experience as a murder investigator. Between 2000 and the time of the trial in this case, Woodward had investigated nearly fifty homicides, of which ten to fifteen, or twenty percent to thirty percent, had involved gunshot wounds to the head. Woodward offered testimony that, in those homicide cases he had worked involving head wounds, his experience was that there was "usually very little blood loss."

The trial court properly admitted this testimony. In *Gruzen v. State*, 276 Ark. 149, 634 S.W.2d 92 (1982), this court held that a police officer was qualified to give a lay opinion as to how long the victim's body had been in a pond, where the officer had over eleven years of experience and had observed bodies that had been in the water for short periods of time as well as for a few days. Because the witness's opinion was "rationally based on his perception of the victim's body when it was removed from the water and on his past experience with drowned persons as a police investigator," this court held that the trial court did not abuse its discretion in admitting the officer's testimony.

■ The same situation occurred in the instant case. Woodward was asked about his experience investigating crime scenes in which the victim had sustained a gunshot wound to the head. His testimony regarding the amount of blood loss in such cases was rationally based on his years of experience as a homicide investigator, and therefore, the testimony was admissible as a lay opinion.

■ ■ Further, the State offered this testimony in its rebuttal case. The purpose of rebuttal evidence is to respond to evidence presented by the defense. *See Pyle v. State*, 314 Ark. 165,

862 S.W.2d 823 (1993). The trial court properly admitted Woodward's testimony to contradict Robinson's own testimony that he had to clean up a great deal of blood after the shooting. The way in which the shooting happened was the primary question for the jury to determine, and Woodward's testimony, which was rationally based on his perception and experience, was helpful to a clear understanding of the determination of a fact in issue. Therefore, the trial court did not abuse its discretion in admitting the testimony under Rule 701.

The transcript of the record in this case has been reviewed pursuant to Ark. Sup. Ct. R. 4–3(h). Rule 4–3(h) requires that, in cases of sentences of life imprisonment or death, we review all prejudicial errors in accordance with Ark. Code Ann. § 16–91–113(a) (1987). None has been found.

Affirmed.

CORBIN, J., not participating.