Shawn Leigh JIMENEZ *v.* STATE of Arkansas

CA CR 02-1111                                                128 S.W.3d 483

Court of Appeals of Arkansas
Division I
Opinion delivered November 12, 2003

*Hampton & Larkowski*, by: *Mark F. Hampton*; and *Jeremy B. Lowrey*, for appellant.

*Mike Beebe*, Att'y Gen., by: *Kent G. Holt*, Ass't Att'y Gen., for appellee.

J OHN MAUZY PITTMAN, Judge. The appellant in this criminal case was charged with solicitation of capital murder of two police officers. After a jury trial, she was convicted of those offenses and sentenced to two thirty-year terms of imprisonment to be served consecutively. From that decision, comes this appeal.

For reversal, appellant contends that the evidence is insufficient to support her convictions; that she was denied a fair trial by the prosecution's reference to terrorist activity; that the trial court erred in refusing to require the State to produce federal Drug Enforcement Administration employment files of a witness; and that the trial court erred in refusing to give proffered jury instruc-

tions on her defense of impossibility and her theory that her conduct was nothing more than constitutionally-protected speech. We affirm.

■ We first address appellant's contention that the evidence is insufficient to support her convictions. In reviewing a challenge to the sufficiency of the evidence, we view the evidence in a light most favorable to the State and consider only the evidence that supports the verdict. *Robinson v. State*, 353 Ark. 372, 108 S.W.3d 622 (May 29, 2003). We affirm a conviction if it is supported by substantial evidence, *i.e.,* evidence that is of sufficient force and character that it will, with reasonable certainty, compel a conclusion one way or the other, without resort to speculation or conjecture. *Id*.

A person commits the offense of capital murder if, with the premeditated and deliberated purpose of causing the death of any law enforcement officer acting in the line of duty, he causes the death of any person. Ark. Code Ann. § 5-10-101(a)(3) (Repl. 1997). Pursuant to Ark. Code Ann. § 5-3-301(a) (Repl. 1997), a person solicits the commission of an offense if, with the purpose of promoting or facilitating the commission of a specific offense, he commands, urges, or requests another person to engage in specific conduct that would (1) constitute that offense; (2) constitute an attempt to commit that offense; (3) cause the result specified by the definition of that offense; or (4) establish the other person's complicity in the commission or attempted commission of that offense.

Viewing the evidence, as we must, in the light most favorable to the appellee, the record reflects that Officers Jerry Hart and Andre Dyer of the Little Rock Police Department were assigned to bicycle patrol in appellant's neighborhood near Central High School. In the course of their patrols, they learned that appellant was a drug addict, and they arrested her several times for various offenses during May 2000. Appellant was angered by these arrests. On May 23, 2000, she told an acquaintance, Bryan Johnston, that she wanted Officer Hart killed. Appellant talked to Johnston for two hours about wanting to have Officer Hart killed.

Unbeknownst to appellant, Bryan Johnston was, in reality, an undercover informant for the federal Drug Enforcement Agency. After appellant expressed her desire to have Officer Hart killed, Johnston became concerned that she might find someone to

do it for her of whom the police would be unaware. Johnston then told appellant that he might know someone who could help her and that he would get back to her after he made a couple of telephone calls. Johnston later telephoned the Drug Enforcement Agency and the Little Rock Police Department and reported the incident. Johnston agreed to contact appellant again and record their conversations. On May 24, 2000, Johnston met appellant. Johnston informed appellant that he found someone who would kill Officer Hart for a price if she still wanted it done. Appellant stated that she did want it done because Officer Hart was making her life miserable. Appellant then asked when the killing would take place, and remarked that she couldn't believe that she was "plotting a murder."

Johnston then had a conversation with appellant in which he told her that he would introduce her to the assassin. On June 6, 2000, Johnston introduced appellant to Steve Pledger, a detective with the Little Rock Police Department who was posing as a hired assassin. Appellant told Steve Pledger that she wanted it done, that she wanted Officer Jerry Hart dead because he tried to send her to the penitentiary. She described Officer Hart as a black police officer who rode "a bicycle over in the hood," and described his beat as being "from 24th Street over to 10th and 11th Street, back down to Martin Luther King, all the way up to Chester." Appellant described Officer Hart's personal automobile and told Steve Pledger where he parked it. She stated that she did not care how the killing was done, just "do it. Do it." Appellant also told Steve that she wanted Officer Hart's partner "Henry" killed as well. (Henry was Officer Dyer's radio call sign.) Appellant agreed to pay Steve $1000 to kill both police officers, although she cautioned Steve that "if something happens, I just — I don't feel like going to the penitentiary for plotting a murder."

Johnston recorded another conversation he had with appellant on June 7, 2000. Appellant informed Johnston that Officer Hart had jailed her again "for walking down the f —— g street" and that she had just been released on probation. Johnston asked appellant if she still wanted his friend. Appellant responded: "Yeah. Are you kidding? But I don't have the money. I can't get on the street."

Johnston telephoned appellant again on June 7, 2000, and told her that Steve would be in town next week and would need to speak to her. Appellant told Johnston to give Steve her address,

"2012 West 17th, and I'll talk to him because I want this done, and I want it done. Once I have [the] $500, I'll have it done. In fact, if I have to f— k for it, I'll have your $500." She then added that "I don't want one of them, I want both of them. I've had it. I've had it. I can't take it any more. My freedom is on the line. Now that - now that I'm on probation, if I walk to the store he throws me in jail."

On June 15, 2000, Steve met again with appellant. Appellant told Steve that she did not yet have the money, but she said that she would get it and reaffirmed her desire to have the police officers killed. She told Steve that Officer Hart wore a bullet-proof vest, agreed that Officer Hart's head was vulnerable despite his protection, and stated that "I want him dead immediately. Yeah. I'd kind of like his partner to watch, and then he'll be next, you know what I'm saying. He'll be like squatting, saying, 'No, no, no, no,' like squealing and everything. You know what I'm saying."

Steve Pledger had a third conversation with appellant on July 21, 2000. He told appellant that the other officer's name was not Henry, but was instead Dyer, and appellant agreed that was correct. Steve told appellant that he was "ready to do it" immediately and had everything lined up for the assassinations. Appellant told Steve that she did not have the money but that she would do what she could to get it.

On August 16, 2000, appellant told Johnston that she was going to leave town to visit her family in Texas so that she would not be around when Steve killed the police officers and she could "hide out there until the heat cooled." Appellant was arrested that day.

■ ■ Appellant argues that there is no evidence that appellant "ever actually urged, commanded, or requested that another person kill" the police officers. There is no merit in that argument. As the testimony recited above clearly indicates, appellant was quite aware that she was plotting a murder, and repeatedly told Steve that she wanted him to kill both police officers. Appellant asserts that her actions were mere "window shopping," and that they did not rise to the level of criminal solicitation because she never paid the purported assassin his agreed-upon fee of $1000. We do not agree. The identical issue was presented to the Maryland Court of Special Appeals in *Gardner v. State*, 41 Md. App. 187, 396 A.2d 303, *aff'd* 286 Md. 520, 408 A.2d 1317 (1979).

There it was argued that Gardner's conviction for solicitation to commit murder should be reversed because the prospective murderer was never actually directed to proceed with a murder, and because payment for the murder, which never occurred, was a condition precedent to any contemplated action by the prospective murder. We agree with the Maryland court's holding that "the crime of solicitation requires neither a direction to proceed nor the fulfillment of any conditions. It is, in essence, asking a person to commit a crime. The gravamen of the offense is in the urging." *Gardner v. State*, 41 Md. App. at 200, 396 A.2d at 311; *accord, State v. Davis*, 110 N.C. App. 272, 429 S.E.2d 403 (1993). Here, the record shows that appellant urged Steve Pledger to engage in specific conduct that would constitute capital murder, and we hold that her convictions are supported by substantial evidence.

Next, appellant contends that she was denied a fair trial by the prosecution's reference to terrorist activity at trial. As noted above, appellant's theory of the case was that no criminal liability would arise until she had actually paid the assassin, and that she had therefore not committed any offense because her behavior was "just talk." In furtherance of this theory, appellant elicited testimony from Detective Steve Pledger conceding that appellant's actions had been "just talk." Immediately afterward, the prosecution on redirect asked Detective Pledger if "just talk" about terrorism was something that warranted police investigation. Appellant then requested a mistrial, which was denied.

Among the factors to be considered in determining whether or not a trial court abused its discretion in denying a mistrial motion are whether the prosecutor deliberately induced a prejudicial response and whether an admonition to the jury could have cured any resulting prejudice. *Jones v. State*, 349 Ark. 331, 78 S.W.3d 104 (2002). We are not convinced that the prosecutor deliberately introduced a prejudicial response in this case. His question on redirect was clearly intended to respond to appellant's previous question to the witness and to address appellant's theory that criminal liability could not be imposed for "just talk."

Although the introduction of the issue of terrorism into this trial was perhaps inflammatory, we think any possible prejudice to appellant could have been cured by an admonition to the jury stating that there was no question of terrorist activity in

this case. In *Wilkins v. State*, 324 Ark. 60, 66, 918 S.W.2d 702, 705-706 (1996), the Arkansas Supreme Court said that:

> [A] mistrial is a drastic remedy which should be resorted to only when there has been an error so prejudicial that justice cannot be served by continuing the trial or where any possible prejudice cannot be removed by admonishing the jury or some other curative relief. *Bullock v. State*, 317 Ark. 204, 876 S.W.2d 579 (1994). An admonition is the proper remedy where the assertion of prejudice is highly speculative. *Banks v. State*, 315 Ark. 666, 869 S.W.2d 700 (1994). . . . This court has held that the failure to request a cautionary instruction or admonition may not inure to the appellant's benefit on appeal. *Stanley v. State*, 317 Ark. 32, 875 S.W.2d 493 (1994).

■ In any event, appellant does not appear to be concerned with any potential bias that might have arisen by virtue of a mistaken association of her behavior with terrorism; instead, her theory of prejudice is that the jury may have been led by the prosecutor's question to misconstrue the law in such a way as to impose criminal liability for mere "talk" without an additional overt act. However, that would not be a misconstruction. As we noted in our discussion of the sufficiency of the evidence, "talk," in the form of urging one to commit a specific criminal act, is precisely what the solicitation statute forbids. We find no error on this point.

Next, appellant argues that the trial court erred in refusing to require the State to produce federal Drug Enforcement Administration employment files of Bryan Johnston pursuant to a request made under Arkansas Rules of Criminal Procedure Rule 17. Appellant's argument is based on *Brady v. Maryland*, 373 U.S. 83 (1963), where the United States Supreme Court held that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material to guilt or punishment, irrespective of the good faith or bad faith of the prosecution." *Id.* at 87.

The Arkansas Supreme Court discussed the subsequent development and application of this rule in *Cloird v. State*, 349 Ark. 33, 37-38, 76 S.W.3d 813, 815-16 (2002), noting that:

In *Strickler v. Greene*, 527 U.S. 263, 119 S.Ct. 1936 (1999), the Court revisited *Brady* and explained its implications. It noted that since the decision in *Brady*, the court had held that the duty to disclose such evidence is applicable even though there has been no request by the accused, and that the duty encompasses impeachment evidence as well as exculpatory evidence. Such evidence is material "if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." Moreover, the rule encompasses evidence "known only to police investigators and not the prosecutor." Therefore, to comply with *Brady*, "the individual prosecutor has a duty to learn of any favorable evidence known to the others acting on the government's behalf. . . ." *Strickler, supra; Larimore [v. State,* 341 Ark. 397, 17 S.W.3d 87 (2000).] In *Strickler,* the court set out the three elements of a true *Brady* violation: (1) the evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; (2) that the evidence must have been suppressed by the State, either willfully or inadvertently; and (3) prejudice must have ensued.

We do not agree that there was reversible error in the case at bar. First, there is no evidence indicating that the employment files themselves were in the hands of any Arkansas state agency or were otherwise subject to the jurisdiction of the court as required by Ark. R. Crim. P. Rule 17.3(b). *See Lukach v. State*, 310 Ark. 119, 835 S.W.2d 852 (1992). Second, it is impossible to tell from the record before us precisely what information appellant was seeking and what she did not obtain. Although she informed the trial judge prior to trial that she had interviewed Johnston but that he gave her "no information with respect to *Brady* material vis-a-vis his prior history with DEA," it is unclear from the record before us what was asked and answered in that interview, whether Johnston refused to answer questions, or whether he simply had no relevant information to offer.

However, it is clear that Johnston did testify at trial concerning his employment as a paid informant for the DEA, describing the manner in which he was paid and disclosing the financial interest he had in the cases to which he was assigned. Johnston also readily testified that he had sex with appellant on one occasion and that he drove her to purchase drugs. While it is well settled that the prosecution's suppression of evidence material either to guilt or to punishment and favorable to an accused

violates the defendant's due-process rights, irrespective of the good faith or bad faith of the prosecution, *Brady v. Maryland, supra,* there is no indication that any such evidence existed in the case at bar. On this record, we think appellant has failed either to establish any violation of *Brady* or to demonstrate that any prejudice ensued.

Next, appellant contends that the trial court erred in failing to give her proffered jury instruction on the defense of impossibility. The proffered instruction, Arkansas Model Jury Instruction — Criminal 503(d)(2), provides an affirmative defense where "the conduct charged to constitute the solicitation was inherently unlikely to result in the commission of a crime and neither the conduct nor the defendant presented a public danger warranting a criminal conviction." Appellant asserts that her conduct was inherently unlikely to result in the commission of a crime because she never paid the purported assassin. This argument, too, is premised on appellant's theory that her conduct was merely "just talk" for which no criminal liability arose until she paid the assassin, a theory that we have rejected *supra.* There was no evidence to support a finding that the murder of the police officers was "inherently unlikely," and we can find no error in the refusal of the instruction offered. *Chronister v. State,* 265 Ark. 437, 580 S.W.2d 676 (1979).

Finally, appellant contends that the trial court erred in failing to give her proffered instruction purporting to set out First Amendment limitations on the power of a state to criminalize speech. Her proffered instruction stated that:

> Speech, which "merely advocates law violation," is protected speech under the First Amendment to the United States Constitution. Criminal prosecution for words is limited to speech which "incites imminent lawless activity." In the event you find Defendant's speech was not speech such that it would "incite imminent lawless activity," you must find the Defendant not guilty of all the offenses charged.

A party is entitled to a jury instruction when it is a correct statement of the law and when there is some basis in the evidence to support giving the instruction. *Jones v. State,* 336 Ark. 191, 984 S.W.2d 432 (1999). An appellant may not complain of the refusal of the trial court to give an instruction which is only partially correct, as it is his duty to submit a wholly correct

instruction. *Merritt v. State*, 82 Ark. App. 351, 107 S.W.3d 894 (2003). It is true that constitutional guarantees of free speech and free press do not permit a state to forbid or proscribe mere advocacy of the use of force or of law violation except where such advocacy is directed to inciting or producing imminent lawless action and is likely to incite or produce such action. *Brandenburg v. Ohio*, 395 U.S. 444 (1969). Here, however, there is no question of mere advocacy. Instead, the only proof before the jury was that appellant contracted to pay Steve Pledger to murder Officers Hart and Dyer. The United States Supreme Court has said that:

> The fact that . . . an agreement [to engage in illegal conduct] necessarily takes the form of words does not confer upon it, or upon the underlying conduct, the constitutional immunities that the First Amendment extends to speech. Finally, while a solicitation to enter into an agreement arguably crosses the sometimes hazy line distinguishing conduct from pure speech, such a solicitation . . . remains in essence an invitation to engage in an illegal exchange for private profit, and may properly be prohibited.

*Brown v. Hartladge*, 456 U.S. 45, 55 (1982). Appellant's proffered instruction does not distinguish between mere advocacy of law violation and an agreement to engage in criminal conduct, and was therefore both misleading to the jury and not a wholly correct instruction. Under these circumstances, the trial court did not err in refusing to submit it to the jury. *See State v. Brown*, 265 Ark. 41, 577 S.W.2d 581 (1979); *Merritt v. State, supra.*

Affirmed.

HART and GRIFFEN, JJ., agree.