SLIP OPINION

Cite as 2016 Ark. App. 501

# ARKANSAS COURT OF APPEALS

DIVISION II
No. CR-16-242

| | | |
|---|---|---|
| JEREMY MYERS | | **Opinion Delivered** OCTOBER 26, 2016 |
| | APPELLANT | |
| V. | | APPEAL FROM THE JEFFERSON COUNTY CIRCUIT COURT [NO. 35CR-2014-363-5] |
| STATE OF ARKANSAS | | |
| | APPELLEE | HONORABLE JODI RAINES DENNIS, JUDGE |
| | | AFFIRMED |

## DAVID M. GLOVER, Judge

Jeremy Myers was convicted by a Jefferson County Circuit Court jury of first-degree endangering the welfare of a minor. He was sentenced by the trial court to six years in prison. His sole point on appeal is that the trial court erred in not giving the jury an instruction on third-degree endangering the welfare of a minor.[1] We affirm.

D.B., who was born on January 26, 2014, and is the son of Myers's girlfriend, Jordyn Billingsley,[2] is the victim in this case. Myers was left alone to care for D.B. on three occasions in 2014—February 25, April 28, and May 28. D.B. was admitted to Arkansas Children's Hospital on May 29 with numerous injuries, including skull fractures, broken ribs, broken legs, and a broken wrist. Myers was arrested and eventually convicted of endangering the welfare of a minor in the first degree.

_____

[1]Myers makes no argument with respect to endangering the welfare of a minor in the second degree.

[2]Myers is not D.B.'s biological father.

SLIP OPINION

Myers argues the trial court erred in not giving a jury instruction on endangering the welfare of a minor in the third degree. An instruction on a lesser-included offense is appropriate when it is supported by even the slightest evidence. *Cole v. State*, 2013 Ark. App. 492. Once an offense is determined to be a lesser-included offense, the circuit court is obligated to instruct the jury on that offense only if there is a rational basis for a verdict acquitting the defendant of the offense charged and convicting him of the lesser-included offense. *Id*. A circuit court's ruling on whether to submit a jury instruction will not be reversed absent an abuse of discretion. *Id*.

A person commits endangering the welfare of a minor in the first degree if, "being a parent, guardian, person legally charged with care or custody of a minor, or a person charged with supervision of a minor, he or she purposely engages in conduct creating a substantial risk of death or serious physical injury to a minor." Ark. Code Ann. § 5-27-205(a)(1) (Repl. 2013). A person commits the offense of endangering the welfare of a minor in the third degree "if the person recklessly engages in conduct creating a substantial risk of serious harm to the physical or mental welfare of a person known by the actor to be a minor." Ark. Code Ann. § 5-27-207(a)(1).

Even assuming endangering the welfare of a minor in the third degree is a lesser-included offense of endangering the welfare of a minor in the first degree,[3] Myers has failed to demonstrate there was a rational basis for giving the instruction for endangering the welfare

---

[3] The State, neither at the circuit court level nor on appeal, made any argument or gave any response to Myers's assertion that third-degree endangering the welfare of a minor is a lesser-included offense of first-degree endangering the welfare of a minor.

2

of a minor in the third degree to the jury. Myers argues on appeal there was a rational basis for acquitting him of first-degree endangering the welfare of a minor and convicting him instead of third-degree endangerment. Specifically, he argues the jury could have found credible his testimony that he did not mean to hurt D.B. when he squeezed him, and therefore he only recklessly engaged in conduct creating a substantial risk of serious harm instead of purposely engaging in conduct creating a substantial risk of death or serious physical injury. We disagree.

Angela Billingsley, D.B.'s grandmother, testified she did not notice any significant injuries to D.B. until after he and his mother had begun to reside with Myers; during the first part of May, she noticed D.B.'s head was larger than it should have known. She said Myers had watched D.B. on May 28, and the next day D.B. was lethargic and had bruises over his left eye and on his face. After taking D.B. to the pediatric clinic at Arkansas Children's Hospital (Children's), it was determined he had significant injuries.

Dr. Karen Farst, a pediatrician at Children's, testified as an expert in both general and child-abuse pediatrics and recounted that she had treated D.B. on May 29, 2014; his head was disproportionately large as to the rest of his body; he seemed lethargic and quiet; there were visible bruises on his forehead and both sides of his face near the jaw line, with two noticeable circles on the jaw line and a small circle near the ear, which Dr. Farst explained was a very typical bruise for an injury inflicted on an infant generally caused by three fingers squeezing the face; and more bruises were discovered on his body when his clothes were removed. D.B.'s CAT scan revealed abnormal findings, including a large amount of subdural blood

between the skull and brain on both sides of the brain lobes, as well as two skull fractures; the fluid was causing so much pressure on D.B.'s brain that he required emergency removal of the fluid to relieve the pressure on his brain and to keep his condition from deteriorating. Dr. Farst explained the most common reason for blood and fluid to collect between the skull and brain was trauma; there was no evidence of hemophilia or other reasons for D.B. to have such issues. Dr. Farst explained that the blood was chronic, meaning it was not recent, but rather was two weeks to a month old; it was her opinion the subdural hematoma had occurred about a month before D.B. was brought to the emergency room. D.B. ultimately had to have a shunt inserted into his brain cavity to continually drain the fluid from his brain. There were also two skull fractures, one on the right parietal bones, and one on the left parietal bones; the two fractures were in different locations and were not part of one continuous injury, but were separate injuries. Dr. Farst testified it was not typical for infants to have skull fractures—that required traumatic impact to the head, which could be caused by a blow to the head or a significant fall, and the fact that D.B. had two different skull fractures made it unlikely a single drop or fall would account for the injuries.

Dr. Farst testified D.B. had forty fractures, many in his rib cage, but in other parts of his body as well; infants could not inflict this amount of injury on themselves; D.B.'s injuries indicated multiple episodes of injury; the most common mechanism for rib fractures was compression of the rib cage; it would be quite unusual to see multiple rib fractures in a line from a single blow; and in D.B.'s case, the numerous fractures in a line would indicate a very forceful, violent compression, not one that happened in normal, everyday care. Bruises on

D.B.'s chest and back corroborated that there had been pressure on his chest; the bruising was more noticeable on the left side of his chest, which matched the fact that most acute fractures were on his left side.

An x-ray of D.B.'s right femur indicated an acute fracture, with the bone being broken straight across; Dr. Farst explained that the femur is the largest bone in the body and is difficult to break straight across; such a break requires that a very high-force energy and a torque or bending force, such as someone stepping on the bone or actually bending the bone, would have to be applied. She explained this fracture would cause immediate pain and distress and would not occur from a routine household fall. An x-ray of D.B.'s left tibia revealed that the edge of the bone showed stages of healing around both sides and also at the base; injuries to the tibia to the extent of D.B.'s injuries are not normal for routine household falls and handling. Additionally, D.B.'s right wrist was broken, and an x-ray of his right foot indicated several fractures with thickened bone around the edge, caused from the foot being squeezed or by someone stepping on or crushing the foot. Dr. Farst testified it would be fair to say that D.B. had been close to death when he arrived in the emergency room, due to a significant recent episode of trauma coupled with the prior existing injuries, causing a rapid decline and a need for emergency intervention.

In a statement to police on May 29 after D.B. had been taken to the hospital, Myers said he thought the skull fracture happened when D.B. was in his care and rolled off the bed in April based on the doctor's statement it had happened about a month ago. Myers admitted in his own statement that he had become frustrated with D.B.'s screaming and had squeezed

him; while he did not think he had squeezed hard enough to hurt him, even though he admitted having left a bruise on one occasion, he "guessed" he had done it. Myers indicated that four days before D.B. was admitted to the hospital was the last time he had squeezed D.B., it was the hardest he had ever squeezed him, and his hand matched the bruises on D.B. Myers also admitted he had pinched D.B. and had covered his mouth when he would not stop crying. He further stated he had caught D.B. by his head to keep him from rolling off the bed the day before he was admitted to the hospital, and he might have rolled over on D.B.'s leg while trying to catch him.

Jordyn Billingsley testified she never saw Myers do anything to cause serious injury to D.B.; however, she admitted Myers pinched D.B., squeezed him, bit him on more than one occasion, and covered D.B.'s mouth to stop him from crying and screaming. She stated that when Myers admitted D.B. had fallen off the bed while he was watching him on April 28 and that he had also bitten D.B., she told him he could not be around D.B. because when he got frustrated, he did things to D.B. he should not do. However, she still allowed Myers to keep D.B. on May 28; during that time, Myers grabbed D.B. to keep him from rolling off the bed and admitted he had squeezed D.B. harder than he had ever squeezed him before because D.B. would not stop crying.

Myers testified in his own defense, admitting D.B. had fallen off the bed while he was watching him on April 28 and seemed lethargic and unresponsive a few hours after the fall; however, he stated D.B. seemed to wake up after Myers gave him a bath. After the bath, Myers said he had been playing with D.B., and he began to get fussy; while he was kissing

6

him, he bit D.B. and left a mark on him. After this incident, he agreed that Billingsley kept him away from D.B. for two or three weeks, but that he kept D.B. again on May 28. He said he had been feeding D.B. on the bed and felt him begin to "slide a little" and reached back and grabbed him; when bruises appeared on D.B.'s face, Myers said he thought they were from him grabbing D.B., even though he did not think he had done it with enough force to leave bruising. Myers stated he learned that D.B. had skull fractures and a broken leg the next day after Billingsley had taken D.B. to the hospital. Myers testified he wondered if the skull fracture had occurred when D.B. fell off the bed, and he thought he might have been holding D.B. too tightly at times; but at trial, Myers testified that after hearing Dr. Farst's testimony, he did not think that he had squeezed D.B. hard enough to break a bone. Myers said other than the biting and pinching, he had never done anything to leave a mark on D.B., and he claimed he had not done those things on purpose. However, he admitted when he was frustrated and upset, he would pinch, squeeze, bite, and cover D.B.'s mouth to muffle his screams. Myers also admitted he had squeezed D.B. on May 28 harder than he had ever squeezed him before, although he did not think it was hard enough to break ribs.

Intent is seldom capable of proof by direct evidence and must usually be inferred from the circumstances of the crime. *Robinson v. State*, 353 Ark. 372, 108 S.W.3d 622 (2003). A person acts purposely with respect to his conduct or a result of his conduct when it is his conscious object to engage in conduct of that nature or to cause the result. Ark. Code Ann. § 5-2-202(1) (Repl. 2013). It is the conduct, not the intended result, that must be undertaken purposefully. *Flurry v. State*, 2014 Ark. App. 128. Because of the difficulty in determining a

SLIP OPINION

defendant's intent, there is a presumption that a person intends the natural and probable consequences of his actions. *Banks v. State*, 2011 Ark. App. 249. Here, Myers admitted he had bitten, pinched, and squeezed D.B.  By his own testimony, Myers admitted he had squeezed D.B. the hardest he had ever squeezed him immediately prior to D.B.'s admission to the hospital, where the acute rib fractures were discovered. Myers's actions were not reckless—they were actions that he purposely undertook after he had become upset and frustrated when D.B. would not stop crying. There was no rational basis for giving an instruction on third-degree endangering the welfare of a minor, and the trial court did not abuse its discretion in refusing to give such an instruction to the jury.

Affirmed.

GLADWIN, C.J., and VIRDEN, J., agree.

*Robinson & Zakrzewski, P.A.*, by: *Luke Zakrzewski*, for appellant.

*Leslie Rutledge*, Att'y Gen., by: *Jake H. Jones*, Ass't Att'y Gen., for appellee.