Jerry Lural EDMOND *v.* STATE of Arkansas

CR 01-1050                                      95 S.W.3d 789

Supreme Court of Arkansas
Opinion delivered January 23, 2003

*David Mark Gunter*, for appellant.

*Mark Pryor*, Att'y Gen., by: *Brad Newman*, Ass't Att'y Gen., for appellee.

DONALD L. CORBIN, Justice. Appellant Jerry Lural Edmond appeals the order of the Hempstead County Circuit Court convicting him of first-degree murder. On appeal, Appellant argues that: (1) the trial court erred in admitting a photograph, because its prejudicial nature outweighed its probative value; and (2) there was insufficient evidence to support his conviction. As Appellant was sentenced to a term of life imprisonment, our jurisdiction is pursuant to Ark. Sup. Ct. R. 1-2(a)(2). We find no error and affirm.

On July 4, 2000, at approximately 4:40 p.m., two emergency medical technicians (EMTs) were dispatched to a residence on 2215 Highway 174 South. After arriving at the residence, the EMTs, David Stuard and Jeffrey Ferrand, discovered that there had been a shooting. Two men were standing outside the residence

and one of the men, Appellant, was pointing to the residence, stating that he had "shot [his] baby." Once inside, Stuard and Ferrand discovered a woman slumped over in a living room chair. The woman, later identified as Maxine Turner, had no pulse or heart rhythm. Appellant was subsequently placed under arrest.

A jury trial was held on February 21, 2001. Testifying on behalf of the State was Lieutenant Frank McJunkins of the Hemp-. stead County Sheriff's Department. He explained that on July 4, he was called to Appellant's residence to investigate a crime scene. Once there, McJunkins discovered Turner's body in a chair in the living room and the murder weapon lying against a living room wall. According to McJunkins, the victim had been shot on the left side of the head, just above the earlobe. The weapon found at the scene of the crime was a thirty-eight caliber revolver that contained one spent casing. According to McJunkins, the placement of the spent casing just to the left of the chamber indicated that there was only one pull of the weapon's trigger. McJunkins also found one live thirty-eight round on top of a table in the living room that matched the round fired from the weapon. A green cloth case used to store the handgun was discovered in a corner of the couch. Inside the case were ten additional rounds of live ammunition.

Deputy Heath Ross testified that on July 4 he received a dispatch at approximately 4:45 p.m. to assist EMTs who were at Appellant's residence. When he arrived at the residence, the EMTs, Appellant, and another man were all present at the scene. At that time, Appellant was standing in the front yard with his hands raised in the air. When Ross asked Appellant to identify himself, he responded by stating, "I shot my baby. I shot my friend. I thought the gun was unloaded. I shot her and it was an accident. We was playing and she told me she was leaving. I told her, 'No, she wasn't,' Oh, my God, I shot my baby." According to Ross, Appellant repeated the statement that he shot Turner two or three times.

Sergeant Brian Russell testified that he assisted in the investigation of the crime scene. Russell first encountered Ferrand, who

explained to him that a woman had been shot. He then drew his weapon and went to talk with Appellant. As Russell approached him, Appellant raised his hands in the air and stated, "I shot her. I shot her." Russell advised Appellant to listen to him as he read him his *Miranda* rights. Afterwards, Appellant continued to repeat that he had shot Turner.

According to Dr. Steven Ericson, an associate medical examiner with the Arkansas State Crime Laboratory, Turner's death was the result of a single gunshot wound to the head. Specifically, he stated that the bullet entered her head in the left temple area, passed through her brain, exited the skull on the right side, and lodged in the skin of the right temple. Dr. Ericson opined that the wound was the result of a close-contact shooting. In other words, the gun was placed near the left temple when it was discharged. Dr. Ericson explained that a wound resulting from a close-contact shooting will reveal gun powder that had been driven underneath the skin. Dr. Ericson further stated that the presence of a light soot rim and a deep, dense soot deposition underneath the scalp confirms that the muzzle of a gun was pressed lightly against a victim's head at the time of discharge. Such a soot deposition was found under Turner's scalp. According to Dr. Ericson, Turner's death was a homicide. On cross-examination, Dr. Ericson stated that he had seen self-inflicted gunshot wounds that looked like Turner's injury, but concluded that this was a homicide based on his physical examination and the investigative materials he received from law enforcement personnel who oversaw this case.

James Looney, a forensic ballistics examiner with the State Crime Lab, also testified. He explained that ballistics tests revealed that the bullet recovered from Turner had been fired from the thirty-eight caliber revolver recovered inside Appellant's living room. Looney also explained that a conscious act was required in order to fire this particular gun. Specifically, it required thirteen to fourteen pounds of steady pressure to pull this gun's trigger.

Leroy Gamble testified that he had known Appellant for a long time and that he often lent Appellant money. In exchange,

Appellant would give Gamble his thirty-eight caliber revolver to hold as collateral. According to Gamble, Appellant came to him on the morning of July 4 to pick up his revolver at about 11:30 a.m.

Jerry Taylor testified that he, along with Mary Williams, lived next door to Appellant. Turner had stayed with the pair the evening before the shooting, but returned to Appellant's residence the following morning. Taylor stated that after the shooting, Appellant knocked on his door asking to call 911, because he had shot Turner. Specifically, Appellant stated to Taylor, "he had killed his loved one."

Mary Williams testified that on July 3, Turner came to her house and wanted to spend the night with her and Taylor in order to keep from arguing with Appellant. The next morning, though, Turner returned to Appellant's house. Williams stated that on the afternoon of July 4, she heard a shot, and shortly thereafter, Appellant came running to their front door, shouting that he had shot Turner.

Barbara Nixon, Turner's best friend, also testified at Appellant's trial. Nixon and Turner had spent July 2 together. According to Nixon, Turner and Appellant would see one another from time to time. She explained that they had known one another for a long time, and would often go through periods where they did not get along. Nixon also stated that Turner had recently started seeing another man. According to Nixon, she and Turner had plans to spend July 4 together. Finally, Nixon stated that Turner had expressed a fear of guns.

Wanda Evans, Turner's daughter, testified that Appellant came to her mother's home on July 3 and begged her to go to his house with him. According to Evans, Turner and the Appellant were not dating at the time of her death. Evans stated that her mother and Appellant had broken up in the past, usually after Appellant pulled a gun on Turner. Evans further explained that Turner would still continue to see Appellant, because he would

bring her crack. Evans also confirmed that her mother did not own a gun and was very scared of them.

At the close of State's case, Appellant moved for a directed verdict, arguing that the State failed to prove the element of purpose with regard to the first-degree-murder charge, as well as the elements of any lesser-included offenses. The motion was denied. Appellant then argued that because the case was based on circumstantial evidence, a directed verdict was warranted, as the State failed to disprove other possible explanations for Appellant's death. The trial court again denied the motion.

Appellant rested without presenting any evidence. The case was then submitted to the jury. Appellant was found guilty of first-degree murder. He was subsequently sentenced as previously set forth. This appeal followed.

■ Actually raised as his second point on appeal, Appellant challenges the sufficiency of the evidence supporting his conviction. Preservation of Appellant's right against double jeopardy, however, requires that we consider the challenge to the sufficiency of the evidence before we consider any alleged trial error. *Price v. State*, 347 Ark. 708, 66 S.W.3d 653 (2002); *King v. State*, 323 Ark. 671, 916 S.W.2d 732 (1996).

■ We are mindful of the well-established standard of review in cases challenging the sufficiency of the evidence. This court treats a motion for a directed verdict as a challenge to the sufficiency of the evidence. *Fairchild v. State*, 349 Ark. 147, 76 S.W.3d 884 (2002); *Branscum v. State*, 345 Ark. 21, 43 S.W.3d 148 (2001). This court has repeatedly held that in reviewing a challenge to the sufficiency of the evidence, we view the evidence in a light most favorable to the State and consider only the evidence that supports the verdict. *Id.*; *Wilson v. State*, 332 Ark. 7, 962 S.W.2d 805 (1998). We affirm a conviction if substantial evidence exists to support it. *Carmichael v. State*, 340 Ark. 598, 12 S.W.3d 225 (2000). Substantial evidence is that which is of sufficient force and character that it will, with reasonable certainty, compel a conclusion one way or the other, without resorting to

speculation or conjecture. *Id.* Circumstantial evidence may provide the basis to support a conviction, but it must be consistent with the defendant's guilt and inconsistent with any other reasonable conclusion. *Fairchild,* 349 Ark. 147, 76 S.W.3d 884; *Bangs v. State,* 338 Ark. 515, 998 S.W.2d 738 (1999). In other words, if you have two equally reasonable conclusions as to what occurred, this merely gives rise to a suspicion of guilt which is not enough to support a conviction. *Howard v. State,* 348 Ark. 471, 79 S.W.3d 273; *cert. denied,* 123 S. Ct. 606 (2002); *Gregory v. State,* 341 Ark. 243, 15 S.W.3d 690 (2000).

Appellant's argument on this point is that other reasonable hypothesis were not excluded by the evidence presented in his case; thus, the State's circumstantial evidence does not rise to the level of substantial evidence to support his conviction. Specifically, Appellant argues that the evidence was not inconsistent with the possibility that he accidentally shot Turner. In other words, Appellant argues that the State failed to prove that he acted with a purposeful mental state. We disagree.

To sustain a conviction for first-degree murder, the State was required to prove that Appellant purposely caused the death of Maxine Turner. *See* Ark. Code Ann. § 5-10-102(a)(2) (Repl. 1997). "A person acts purposely with respect to his conduct or a result thereof when it is his conscious object to engage in conduct of that nature or to cause such a result[.]" Ark. Code Ann. § 5-2-202(1) (Repl. 1997). A criminal defendant's intent or state of mind is seldom capable of proof by direct evidence and must usually be inferred from the circumstances of the crime. *Smith v. State,* 337 Ark. 239, 988 S.W.2d 492 (1999); *Mulkey v. State,* 330 Ark. 113, 952 S.W.2d 149 (1997). Thus, this court has recognized that the intent necessary to sustain a conviction for first-degree murder may be inferred from the type of weapon used, the manner of its use, and the nature, extent, and location of the wounds. *Id.; Sanders v. State,* 340 Ark. 163, 8 S.W.3d 520 (2000). This court has held that guilt can be established without eyewitness testimony and evidence of guilt is not less because it is

circumstantial. *Ross v. State*, 346 Ark. 225, 57 S.W.3d 152 (2001); *Gregory*, 341 Ark. 243, 15 S.W.3d 690.

As previously stated, the longstanding rule in the use of circumstantial evidence is that, to be substantial, the evidence must exclude every other reasonable hypothesis than that of the guilt of the accused. *Fairchild*, 349 Ark. 147, 76 S.W.3d 884; *Smith*, 337 Ark. 239, 988 S.W.2d 492. It is only every other reasonable hypothesis, not every hypothesis, that must be excluded by the evidence. *McDole v. State*, 339 Ark. 391, 6 S.W.3d 74 (1999). It is also well settled that the question of whether the circumstantial evidence excludes every hypothesis consistent with innocence is for the jury to decide. *Id.* Upon review, this court's role is to determine whether the jury resorted to speculation and conjecture in reaching its verdict. *Ross*, 346 Ark. 225, 57 S.W.3d 152; *Phillips v. State*, 344 Ark. 453, 40 S.W.3d 778 (2001). Overwhelming evidence of guilt is not required in cases based on circumstantial evidence; rather, the test is one of substantiality. *Id.*

Here, as the State points out, there was testimony at trial from six different witnesses who heard Appellant admit that he shot and killed Turner. One of those witnesses, Deputy Ross, testified that Appellant told him that Turner stated that she was going to leave, but Appellant would not allow her to do so. Then, Appellant continued to repeat that he had shot her. There was also evidence presented regarding the tumultuous relationship between Appellant and Turner, including the fact that Turner had started seeing someone else. There was also evidence that the two had broken up in the past because Appellant had pulled a gun on Turner. In fact, the night before the shooting, Turner left Appellant and went to stay with a neighbor in order to avoid fighting with him. The very next morning, Appellant went and retrieved his gun from Gamble.

Also supporting the conclusion that this was not an accidental shooting was the forensic evidence presented by the State. According to Dr. Ericson, Turner died as a result of a close-contact wound. Moreover, there was testimony from Looney, the forensics ballistic expert, that a conscious act was required to fire

the gun, and that it would take thirteen to fourteen pounds of pressure to fire the weapon. It is axiomatic that a jury need not lay aside its common sense in evaluating the ordinary affairs of life, and it may infer a defendant's guilt from improbable explanations of incriminating conduct. *Branscum*, 345 Ark. 21, 43 S.W.3d 148; *Goff v. State*, 329 Ark. 513, 953 S.W.2d 38 (1997). Considering all this evidence in a light most favorable to the State, we are convinced that there was substantial evidence to support the jury's verdict. Accordingly, we affirm on this point.

■ Appellant's remaining argument on appeal is that the trial court erred in admitting a photograph depicting the inside of Turner's head after an incision was made by the medical examiner. According to Appellant, the photograph possessed no probative value and served only to inflame the jury. Appellant further argued that the photograph would be cumulative and repetitive, as the doctor's testimony was sufficient to establish his opinion regarding the cause of death. The State countered that the purpose of the photograph was to help Dr. Ericson in his testimony regarding the nature of Turner's close-contact wound and, thus, was properly admitted. The admissibility of photographs lies in the sound discretion of the trial judge and will not be reversed absent an abuse of discretion. *Mosby v. State*, 350 Ark. 90, 85 S.W.3d 500 (2002); *Ramaker v. State*, 345 Ark. 225, 46 S.W.3d 519 (2001). No such abuse of discretion occurred here; thus, we find no merit in Appellant's argument on this point.

■ When photographs are helpful to explain testimony, they are ordinarily admissible. *Id*. The mere fact that a photograph is inflammatory or is cumulative is not, standing alone, sufficient reason to exclude it. *Id*. (citing *Jones v. State*, 336 Ark. 191, 984 S.W.2d 432 (1999)). Even the most gruesome photographs may be admissible if they tend to shed light on any issue, are useful in enabling a witness to testify more effectively or by corroborating testimony, or by enabling jurors to better understand the testimony. *Id*; *Branscum*, 345 Ark. 21, 43 S.W.3d 148. Other acceptable purposes are to show the condition of the victims' bodies, the probable type or location of the injuries, and the position

in which the bodies were discovered. *Jones v. State*, 340 Ark. 390, 10 S.W.3d 449 (2000).

In *Mosby*, 350 Ark. 90, 85 S.W.3d 500, this court recently discussed the admissibility of gruesome photographs, including a picture that depicted a cross-section of the victim's brain. In that case, the appellant argued that the photograph was unfairly inflammatory and prejudicial. We disagreed, ruling that the picture was properly admitted, because its probative value outweighed its prejudicial effect. Specifically, this court pointed out that the photograph assisted the trier of fact, as it was introduced to corroborate the medical examiner's testimony about the path of the bullet through the victim's brain and the fact that the wound contained necrotic tissue. *Id.*

Likewise, in the present case, this photograph was admitted during the course of the medical examiner's testimony regarding the nature of the victim's wound. Out of the presence of the jury, Dr. Ericson explained that it was necessary to make an incision and examine the soft tissue under Turner's scalp to look for black sooty matter in order to ultimately determine that this was a close-contact shooting. This soot can be discerned in the photograph. Thus, the photograph aided Dr. Ericson in explaining to the jury how he reached his ultimate conclusion that Turner's death was the result of a close-contact wound. While the photograph may be gruesome, there is nothing to support Appellant's accusation that it was admitted for the sole purpose of inflaming the jury. Accordingly, we cannot say that the trial court abused its discretion in admitting the photograph.

The record in this case has been reviewed for other reversible error in accordance with Ark. Sup. Ct. R. 4-3(h), and none has been found. For the aforementioned reasons, the judgment of conviction is affirmed.