Cite as 2023 Ark. 64

# SUPREME COURT OF ARKANSAS

No. CR-22-192

| | | |
|---|---|---|
| | | **Opinion Delivered:** April 20, 2023 |
| RAKEEM HARRIS | APPELLANT | APPEAL FROM THE MISSISSIPPI COUNTY CIRCUIT COURT [NO. 47BCR-19-122] |
| V. | | |
| STATE OF ARKANSAS | APPELLEE | HONORABLE CHARLES MOONEY, JR., JUDGE |
| | | AFFIRMED. |

**KAREN R. BAKER, Associate Justice**

On September 16, 2021, a Mississippi County Circuit Court jury convicted appellant, Rakeem Harris, of first-degree murder. Harris was sentenced to life plus an additional 204 months' imprisonment as a result of sentence enhancements imposed for the use of a firearm in the commission of a felony and for the commission of first-degree murder in the presence of a child. On appeal, Harris presents five points: (1) the circuit court's ruling denying Harris's motion for a directed verdict was reversible error; (2) the circuit court erred by admitting the officer's recordings of the surveillance video; (3) the circuit court erroneously submitted an improper jury instruction to the jury; (4) jury misconduct deprived Harris of a fair trial; and (5) the State's closing remarks rose to the level of prosecutorial misconduct. We affirm.

I. *Facts and Procedural History*

This appeal stems from the death of Malikk Holliman[1] on March 30, 2019. On April 15, 2019, Harris was charged with first-degree murder. On September 14–16, 2021, Harris's jury trial was held. The record before us establishes the following facts.

On March 30, security cameras from Danny's Store in Blytheville captured Holliman's murder from various angles. The surveillance-video footage demonstrated that Harris arrived at Danny's Store and parked his car on the left side of the parking lot. Harris and his child went inside the store and returned to the car shortly after. Holliman is then seen entering the store. A few moments later, Harris's brother, Renaldre Harris, pulled into the parking spot adjacent to Harris. Renaldre parked his car, walked over to where Harris was parked, and the two had a brief conversation during which Renaldre appeared to be monitoring the entrance of the store and adjusting his waistband area. Renaldre then entered the store, and a confrontation with Holliman ensued immediately inside the front door. Renaldre brandished a handgun, and the two men engaged in a brief physical altercation inside the store. Holliman ran out the front door as Renaldre chased him. Renaldre fired at Holliman, and Holliman returned fire as he retreated across the street. Renaldre then ran back inside the store. During this time, Harris remained in his parked car. Holliman safely made it across the street but returned to the store moments later, appearing to retrieve the

---

[1]The victim is identified both as "Malikk Holliman" and "Malik Holliman." The victim's Social Security card and his state-issued identification card demonstrate that the correct spelling of his first name is "Malikk."

magazine from his firearm which had fallen on the store's welcome mat, when Harris stepped out of his car, fired several shots at Holliman, and then immediately got back into his car and drove away.

On December 26, 2019, Harris filed a motion in limine to exclude the videos of the surveillance-video footage alleging that the evidence lacked sufficient authentication and did not comply with the Arkansas Rules of Evidence because the videos were recordings of the footage taken by law enforcement. Harris argued that law enforcement's recordings of the security footage could not be properly authenticated because the State lacked testimony of witnesses who could verify that the video accurately depicted what occurred, describe how the security system operated and its reliability, and verify the chain of custody of the videos. Harris further alleged that the videos did not comply with the Arkansas Rules of Evidence because they were neither originals nor bona fide duplicates, and because the danger of unfair prejudice and misleading the jury substantially outweighed any probative value the videos held.

On January 14, 2020, the circuit court held a hearing on Harris's motion in limine. The owner of Danny's Store, Nasim "Danny" Anaam, testified that he was working on the day of the murder and explained the specifics of his digital-video-recorder ("DVR") security system and the events that transpired on the day of the murder. Anaam explained that the store's surveillance cameras recorded twenty-four hours a day, from Sunday to Sunday each week, and the DVR system recorded over its own footage every seven days. He further testified that on the day of the murder, the security cameras were running properly, he called

3

law enforcement, and once officers arrived, he provided them access to the DVR system so that they could view the surveillance-video footage. Anaam testified that when officers asked him for the original surveillance-video footage from the DVR system, he explained that he did not know how to provide the video. Anaam testified further that he and his uncle assisted the officers in navigating through the footage and that the officers started to record videos of the surveillance-video footage on their cell phones. Anaam testified that although he was not actively observing law enforcement as they captured the recordings, he did not observe law enforcement tamper with the DVR system. Finally, Anaam testified that on the same day, during the investigation, he ultimately provided law enforcement with the entire DVR system.

Captain Jeremy Ward and Detective Vanessa Stewart with the Blytheville Police Department ("BPD"), two of the responding officers to the murder, both testified at the hearing. Captain Ward and Detective Stewart testified that, to preserve the surveillance-video footage, they used their BPD-issued cell phones to record the footage as it played on the monitors at the store. Captain Ward testified that he also took still photographs of the surveillance-video footage as it played. Captain Ward further testified that the hard drive from the DVR system was sent to the Arkansas State Crime Laboratory, but the lab was unable to extract any of the original surveillance-video footage. Captain Ward and Detective Stewart testified that upon returning to the station on the day of the murder, they uploaded the videos from their cell phones directly into the case file in BPD's record-management system, a server that houses BPD's digital evidence. Captain Ward and Detective Stewart

4

further testified that the videos accurately depicted the footage that they had viewed at the store on the day of the murder and that neither the videos nor the DVR system had been tampered with.

At the conclusion of the hearing, the circuit court denied Harris's motion in limine, and an order was entered on September 14, 2021, finding that the testimony at the hearing provided the proper foundation necessary to authenticate the surveillance-video footage; the DVR system was functioning properly at the time of the murder; there was no evidence of evidence tampering with respect to the videos; the State made a good-faith effort to produce the original surveillance-video footage, which was not available; the surveillance-video footage was relevant under the circumstances; and the probative value of the videos substantially outweighed any risk of unfair prejudice.

At trial, Dr. Stephen Erickson, Deputy Chief Medical Examiner for the State, testified that Holliman sustained three distinct gunshot wounds that all traveled from back to front. Dr. Erickson testified that the fatal gunshot entered the back of Holliman's neck and exited above his right eyebrow, traveling left to right. With regard to the two remaining gunshots, Dr. Erickson testified that one of them also traveled from left to right and the other traveled from right to left. Dr. Erickson further testified that he was unable to determine which of the three gunshot wounds occurred first, but the official cause of death was "multiple gunshot wounds."

Detective Chelsey Grimes[2] with the BPD was the lead detective and testified that she arrived at Danny's Store on the day of the murder. Detective Grimes testified that the collected evidence included seven 9mm shell casings that were found in close proximity to each other, two .40-caliber shell casings, a .40-caliber firearm, a loaded .40-caliber magazine, and a bullet fragment that was found under Holliman's body. Finally, Detective Grimes testified that law enforcement was able to determine that Harris's car had been located near the group of 9mm shell casings.

Deborah Britton,[3] Senior Firearm and Toolmark Examiner at the Arkansas State Crime Laboratory, testified that the seven 9mm shell casings recovered from the scene had all been fired from the same firearm. Britton further testified that, of the two total .40-caliber shell casings recovered at the scene, only one of the casings was fired from the .40-caliber firearm that was recovered beside Holliman's body. Additionally, Britton testified that, based on its physical characteristics, the bullet fragment that was found under Holliman's body was in the .38-caliber class. Britton explained that 9mm ammunition fits within the .38-caliber class.

Without objection, the State introduced six total surveillance videos. Captain Ward and Detective Stewart testified that they had viewed the surveillance-video footage at Danny's

---

[2]The transcript refers to Detective "Chelsea Grimes," but the record demonstrates that the correct spelling of her first name is "Chelsey."

[3]The transcript refers to "Debra Brittan," but the firearms report in the record demonstrates that the correct spelling is "Deborah Britton."

Store on March 30, 2019. Both officers identified Harris, Renaldre, and Holliman from the surveillance-video footage and described the events surrounding Holliman's murder as depicted on the footage. Detective Stewart testified that Harris was positioned on the north side of Holliman at the time of the shooting, which was behind Holliman to the right. Officer Michael Dannar with the BPD testified that he collected the hard drive from the DVR system at Danny's Store on March 30, 2019.

Harris testified that he had taken his two-year-old son to Danny's Store to get something to eat. Harris testified that he and Renaldre exchanged greetings when Renaldre arrived at the store, and Renaldre told Harris that he had come to retrieve his cell phone from the store. Harris further testified that he heard gunshots while he was feeding his son in his car and looked up to see Renaldre and Holliman firing at each other. Harris also testified that he thought the altercation between Renaldre and Holliman had ended once Holliman fled the scene, but Harris became worried about Renaldre's safety when he saw Holliman run back toward the store. Harris testified that he then blacked out and started shooting in Holliman's direction with his 9mm firearm, and that he did not intend to shoot or kill Holliman, but merely shot in his direction to scare Holliman because he wanted to protect Renaldre. Harris testified that he did not know who shot Holliman, because even though he never saw anyone else in the area, he heard other gunshots. Harris also testified that he did not know Holliman, nor had he ever seen him before.

After the State rested, Harris moved for a directed verdict. In his motion, Harris contended that the State had neither proved that he had acted purposely nor that he had

7

caused Holliman's death. Specifically, Harris asserted that the evidence and testimony at trial showed that the gunshot that caused Holliman's death came from the opposite direction of where Harris was standing, and thus, he could not have been responsible for Holliman's death. At the close of evidence, Harris renewed his motion for a directed verdict. The circuit court denied both motions.

During the State's closing argument, the prosecutor said, "I submit to you everything that we told you in our opening we, in fact, have showed you . . . [t]he Defense told you a lot of things that they didn't prove to you, they didn't give you evidence of." Harris did not object. Instead, in Harris's closing argument, he stated, "I don't have to prove the case. So for the Prosecution to say that [Harris] didn't stand up here and prove [his] case. That's actually not the law and inappropriate because I don't have to do that. What I have to show is that they didn't put on any evidence." The case was then sent to the jury.

Prior to jury deliberations, the jury instruction for Harris's defense of justification was in controversy. Harris first argued that, for purposes of instructing the jury, the Arkansas "Stand Your Ground" law that became effective on July 28, 2021, should be applied retroactively to these facts because it is procedural in nature. *See* Act 250 of 2021. In the alternative, Harris argued that the language regarding the duty to retreat should not have been included in the instruction for defense of others because the statute imposed a duty to retreat only in situations involving self-defense. The circuit court declined to modify the AMI Crim. 2d 705 jury instruction.

8

On September 16, 2021, Harris was convicted and sentenced as described above. On October 4, Harris filed his second amended motion for a new trial and motion for judgment notwithstanding the verdict pursuant to Rule 33.3 of the Arkansas Rules of Criminal Procedure. On October 6, a hearing was held on Harris's motion. Harris alleged juror misconduct had occurred and that he was entitled to a new trial, contending that Juror Hawkins informed Harris after the trial had concluded that, during deliberations, a bailiff had told another juror that Renaldre received a life sentence for his role in the events surrounding Holliman's murder. In accordance with Rule 606(b) of the Arkansas Rules of Evidence,[4] the circuit court held a hearing and allowed limited testimony to determine whether any extraneous information had been brought to the attention of the jury.

The testimony from the hearing was as follows. Juror Hawkins testified that one of two possible jurors announced to the jury room that Renaldre had received a life sentence, and asked, "[H]ow could we give [Harris] anything less?" However, Juror Hawkins could not positively identify the juror responsible. Juror Hawkins further testified that although she did not know who gave the juror this information, she heard that the information came from a bailiff. The bailiff, Deputy Jimmy Brooks, testified that he was not approached by any jurors, and he did not provide information to any jurors regarding Renaldre's sentence. Juror

---

[4]Rule 606(b) states that, "[u]pon an inquiry into the validity of a verdict or indictment, a juror may not testify as to any matter or statement occurring during the course of the jury's deliberations . . . *but a juror may testify on the questions whether extraneous prejudicial information was improperly brought* to the jury's attention or whether any outside influence was improperly brought to bear upon any juror." (Emphasis added.)

9

Luttrell testified that he heard a comment about Renaldre's sentence after the jury had already reached a decision, but he did not know who made the comment. Juror Luttrell testified further that he could not recall what the comment was, because "it wasn't pertinent to this case." Juror Herron testified that someone mentioned Renaldre's sentence at some point before the jury had made its decision, but he did not know who mentioned it or what exactly was said. Juror Herron testified further that the bailiff never approached him with information about Renaldre's sentence. Juror Perkins, when asked if Renaldre's sentence came to his attention during trial, responded, "Well, no, not really." Juror Perkins testified further that he thought he heard something about Renaldre during the course of the trial but did not recall details. Based on the above testimony, the circuit court found that there was no jury misconduct because it appeared that the jurors were referring to testimony about Renaldre from Harris's trial.

Also relevant to this appeal, at the hearing on the motion for new trial, Harris argued that the model jury instruction that was submitted to the jury, AMI Crim. 2d 705, was improper because it included language about the duty to retreat. According to Harris, Arkansas Code Annotated section 5-2-607 (Supp. 2019), which the instruction is modeled after, attaches a duty to retreat only to self-defense and not to defense of others. The circuit court rejected this argument, holding that the jury instruction correctly stated the law in effect at the time of the murder, and that it is for the jury to decide whether the justification applied under the facts of this case.

10

Finally, Harris argued that the State's comments during its closing argument were an attempt to shift the burden of proof to Harris and grounds for a mistrial. Specifically, Harris asserted that, although a contemporaneous objection was not made during the State's closing argument, an exception to the contemporaneous-objection rule applies and requires the court to consider the issue. The circuit court denied Harris's motion.

This timely appeal followed.

## II. *Points on Appeal*

### A. Sufficiency of the Evidence

For his first point on appeal, Harris argues that the circuit court erred when it denied his motion for a directed verdict. On appeal, a motion for directed verdict is treated as a challenge to the sufficiency of the evidence. *Reynolds v. State*, 2016 Ark. 214, 492 S.W.3d 491. In reviewing a challenge to the sufficiency of the evidence, we view the evidence in the light most favorable to the State and consider only the evidence that supports the verdict. *Edmond v. State*, 351 Ark. 495, 95 S.W.3d 789 (2003). We will affirm a conviction if substantial evidence exists to support it. *Id.* Substantial evidence is that which is of sufficient force and character that it will, with reasonable certainty, compel a conclusion one way or the other, without resorting to speculation or conjecture. *Dortch v. State*, 2018 Ark. 135, at 5, 544 S.W.3d 518, 522. This court does not weigh the evidence presented at trial or assess the credibility of the witnesses, because those are matters for the fact-finder. *Id.* The trier of fact is free to believe all or part of any witness's testimony and may resolve questions of conflicting testimony and inconsistent evidence. *Id.* Further, circumstantial evidence may

provide a basis to support a conviction, but it must be consistent with the defendant's guilt and inconsistent with any other reasonable conclusion. *Edmond*, 351 Ark. 495, 95 S.W.3d 789. Whether the evidence excludes every other hypothesis is left to the jury to decide. *Carmichael v. State*, 340 Ark. 598, 12 S.W.3d 225 (2000).

With these standards in mind, we turn to Harris's first point on appeal. Harris was convicted of first-degree murder. Pursuant to Arkansas Code Annotated section 5-10-102(a)(2), a person commits first-degree murder if "[w]ith a purpose of causing the death of another person, the person causes the death of another person." Ark. Code Ann. § 5-10-102(a)(2) (Supp. 2021). Further, "[a] person acts purposely with respect to his or her conduct or a result of his or her conduct when it is the person's conscious object to engage in conduct of that nature or to cause the result." Ark. Code Ann. § 5-2-202(1) (Repl. 2013). Finally, "[c]ausation may be found when the result would not have occurred but for the conduct of the defendant operating either alone or concurrently with another cause unless: (1) [t]he concurrent cause was clearly sufficient to produce the result; and (2) [t]he conduct of the defendant was clearly insufficient to produce the result." Ark. Code Ann. § 5-2-205 (Repl. 2013).

Harris contends that the evidence presented at trial was not sufficient to support the verdict because it did not prove beyond a reasonable doubt that Harris caused Holliman's death. Harris alleges that Dr. Erickson's testimony that the fatal gunshot entered the left side of Holliman's neck and Detective Stewart's testimony that Harris was standing to the right of Holliman undermines the verdict. The State responds that the surveillance-video footage

from Danny's Store clearly shows Harris aim his firearm toward Holliman and fire several shots, and Holliman immediately collapses to the ground. The State further responds that there is sufficient evidence to corroborate the surveillance-video footage because there were seven 9mm shell casings found on the ground where Harris was standing in the video, Harris admitted that he used a 9mm firearm, and Britton's testimony established that the bullet fragment found under Holliman's body was in the .38-caliber class, which includes 9mm ammunition. We agree.

Here, in the record before us, the surveillance-video footage demonstrates that Harris shot Holliman from behind, thereby causing Holliman's death. Dr. Erickson testified that Holliman's official cause of death was multiple gunshot wounds and that the gunshots Holliman sustained came from behind Holliman and traveled both left to right and right to left. The surveillance-video footage is consistent with the testimony showing Harris firing at Holliman, with Holliman's left side exposed to Harris. Further, Harris's own testimony supports his conviction as he testified that he shot toward Holliman several times using a 9mm firearm. Detective Grimes testified that a collection of seven 9mm shell casings was found at the scene. The surveillance-video footage also demonstrates that Harris's car was parked near this group of 9mm shell casings at the time of the shooting. State crime-lab examiner Deborah Britton testified that all seven 9mm shell casings recovered from the scene were fired from the same firearm. Britton testified further that the bullet fragment found under Holliman's body was in the .38-caliber class and that 9mm firearm ammunition is included within the .38-caliber class. When considering this evidence in the light most

13

favorable to the State, we find that there was substantial evidence to support Harris's first-degree-murder conviction. Therefore, the circuit court did not err in denying Harris's motion for directed verdict.

## B. Admission of Surveillance Videos

For his second point on appeal, Harris contends that the circuit court abused its discretion when it admitted the surveillance videos from Danny's Store that Captain Ward and Detective Stewart recorded with their BPD-issued cell phones. Circuit courts have broad discretion in deciding evidentiary issues, and their rulings on the admissibility of evidence are not reversed on appeal absent an abuse of discretion. *Halliburton v. State*, 2020 Ark. 101, 23, 594 S.W.3d 856, 870. Abuse of discretion is a high threshold that does not simply require error in the trial court's decision, but requires that the trial court act improvidently, thoughtlessly, or without due consideration. *Arnold v. State*, 2022 Ark. 191, at 7, 653 S.W.3d 781, 787. Further, we will not reverse unless the appellant demonstrates that he was prejudiced by the evidentiary ruling. *Collins v. State*, 2019 Ark. 110, 5, 571 S.W.3d 469, 471–72.

### 1. *Duplicates*

Harris first contends that the surveillance videos were not properly admitted pursuant to Rules 1002 and 1003 of the Arkansas Rules of Evidence because the videos were neither originals nor proper duplicates. The State responds that the videos were properly admitted as duplicates of the original surveillance video footage because, under Rule 1001, a duplicate can be produced by means of photography. The State contends that, by statutory definition,

14

"photograph" includes videos, and although "photography" is not likewise defined in the applicable sections of the Arkansas Rules of Evidence, videography is an analogous process that produces a proper duplicate. The State further responds that there was no evidence that the surveillance-video footage was altered in any way. We agree.

Generally, "to prove the content of a writing, recording, or photograph, the original writing, recording, or photograph is required." Ark. R. Evid. 1002. However, "a duplicate is admissible to the same extent as an original unless (1) a genuine question is raised as to the authenticity or continuing effectiveness of the original or (2) in the circumstances it would be unfair to admit the duplicate in lieu of the original." Ark. R. Evid. 1003. "Photograph" includes "video tapes." Ark. R. Evid. 1001(2). A duplicate "is a counterpart produced by the same impression as the original, or from the same matrix, or by means of photography, including enlargements and miniatures, or by mechanical or electronic re-recording, or by chemical reproduction, or by other equivalent techniques which accurately reproduce the original." Ark. R. Evid. 1001(4).

Here, Captain Ward and Detective Stewart used their BPD-issued cell phones to record the surveillance video footage at Danny's Store in real time as they observed the monitors. As discussed above, a duplicate can be a counterpart produced by means of photography or other equivalent techniques that accurately reproduce the original. Therefore, a video recording that captures an original video is a proper duplicate under the Arkansas Rules of Evidence. Further, there is no evidence in the record to suggest that the surveillance-video footage had been tampered with. Instead, Anaam testified that the

15

surveillance cameras were running properly, and he did not witness anyone tampering with the DVR system. He testified further that because he did not know how to obtain the original video from the DVR system, he provided law enforcement with the entire DVR system. However, the original surveillance-video footage was unavailable because the crime lab was unable to extract any of the original footage. Both Captain Ward and Detective Stewart testified that the videos accurately depicted the footage, and neither the videos nor the DVR system had been tampered with.

On this basis, we hold that the videos are proper duplicates in accordance with Rule 1003 of the Arkansas Rules of Evidence that fairly and accurately represent the original surveillance recordings and affirm the circuit court.

### 2. *Unfair prejudice*

Harris next asserts that the probative value of the surveillance-video footage was substantially outweighed by the danger of unfair prejudice under Rule 403 of the Arkansas Rules of Evidence, because the videos are misleading in light of the testimony and physical evidence presented at trial. Specifically, Harris contends that the videos lack probative value because the videos show only three shooters while Britton's testimony allegedly showed that there were four firearms used in the shooting. Further, Harris asserts that, while testimony at trial establishes that the fatal gunshot came from the left, the video shows Harris shooting Holliman from the right. In sum, Harris contends that based on these inconsistencies, the videos unfairly prejudiced Harris.

Relying on *Lard v. State*, 2014 Ark. 1, 431 S.W.3d 249, and *Williams v. State*, 374 Ark. 282, 287 S.W.3d 559 (2008), the State responds that the probative value of the surveillance-camera footage is immense, as the videos provide clear evidence of every essential element of the charged crime. The State further responds that there was no risk of unfair prejudice or jury confusion in admitting these videos because the footage does not conflict with the testimony at trial. We agree.

Pursuant to Rule 401, evidence is relevant when it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Ark. R. Evid. 401. However, "[a]lthough relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Ark. R. Evid. 403. Therefore, a circuit court "may refuse to admit evidence that is unfairly prejudicial to the defendant, even if it might be relevant." *Lard*, 2014 Ark. 1, at 7, 431 S.W.3d at 258. We have observed that "evidence offered by the State is often likely to be prejudicial to the accused, but the evidence should not be excluded unless the accused can show that it lacks probative value in view of the risk of unfair prejudice." *Id.*

In *Lard*, Lard challenged the admissibility of video evidence of the shooting of the victim as recorded by police-cruiser dash cameras. *Id.* at 19, 431 S.W.3d at 264. We held that the probative value of video recordings substantially outweighed the danger of unfair prejudice because "[a]lthough there were witnesses to the events, the recordings represent an

17

objective portrayal of what occurred . . . and served both to corroborate and to explain the eyewitnesses' testimony . . . [b]ecause the incident unfolded so quickly, showing the events as they transpired from different perspectives and at slowed speeds allowed the actions of all involved to be clarified and placed in context." *Id.* at 21, 431 S.W.3d at 265. In *Williams*, Williams challenged the admissibility of video evidence depicting him engaging children in sexually explicit conduct. 374 Ark. at 289, 287 S.W.3d at 565. Likewise, we affirmed the circuit court's determination that the probative value of the video footage was not substantially outweighed by the danger of unfair prejudice because "[t]he State is entitled to prove its case as conclusively as it can . . . [and] had the burden of proving the elements of all of the charges against Williams." *Id.* at 291, 287 S.W.3d at 566.

As in *Lard* and *Williams*, we conclude that the probative value of the surveillance-video footage introduced at Harris's trial substantially outweighed the danger of unfair prejudice. Here, the surveillance-video footage provided evidence of the murder and the parties involved from multiple angles. Further, the State used the video as evidence to prove the elements of first-degree murder. Based on our discussion above, we hold that the circuit court did not abuse its discretion in admitting the surveillance videos and affirm the circuit court.

## C. Jury Instructions

For his third point on appeal, Harris contends that the circuit court erred when it submitted jury instruction AMI Crim. 2d 705 to the jury. First, Harris asserts that the circuit court should have applied Act 250 retroactively in its instruction to the jury regarding the

defense of justification because, although the Act did not expressly state that it should apply retroactively, the Act was procedural in nature. In the alternative, Harris argues that the language regarding the duty to retreat included in AMI Crim. 2d 705 was erroneous. The State responds that Harris did not properly preserve the issues related to the jury instructions because Harris proffered no jury instructions into the record. We agree.

A circuit court's ruling on whether to submit a jury instruction will not be reversed absent an abuse of discretion. *Kinsey v. State*, 2016 Ark. 393, at 9, 503 S.W.3d 772, 778. Further, we have held that "[i]t is the appellant's duty to present to this court a record sufficient to show that the circuit judge erred below. To preserve an objection to an instruction for appeal, the appellant must make a proffer of the proposed instruction to the judge. That proffered instruction must then be included in the record . . . to enable the appellate court to consider it. An instruction that is not contained in the record is not preserved and will not be addressed on appeal." *Robertson v. State*, 2009 Ark. 430, at 3, 347 S.W.3d 460, 462 (internal citations omitted).

Here, because Harris failed to proffer proposed instructions, the issue is not preserved for our review. Therefore, we affirm the circuit court.

### D. Jury Misconduct

For his fourth point on appeal, Harris asserts, as he did in his motion for a new trial, that jury misconduct deprived him of a fair trial.

"The decision whether to grant a new trial is left to the sound discretion of the trial court, and it is not reversed in the absence of an abuse of discretion or manifest prejudice to

the complaining party." *McIntosh v. State*, 340 Ark. 34, 41, 8 S.W.3d 506, 510 (2000) (internal citations omitted). "A trial court's factual determination on a motion for a new trial will not be reversed unless clearly erroneous." *State v. Cherry*, 341 Ark. 924, 928, 20 S.W.3d 354, 357 (2000). A finding is clearly erroneous when, although there is evidence to support it, the appellate court after reviewing the entire evidence is left with the definite and firm conviction that a mistake has been committed. *Arnold*, 2022 Ark. 191, at 4, 653 S.W.3d at 786.

Harris contends that he was deprived of a fair trial because the jury was told that Renaldre received a life sentence as a result of the same incident. Relying on *Cherry*, Harris asserts that it is reasonable to infer that knowledge of Renaldre's guilt could have swayed members of the jury to likewise find Harris guilty or impose a life sentence. The State responds that the circuit court's denial of Harris's motion for a new trial based on juror misconduct was not an abuse of discretion. We agree.

"The party moving for a new trial bears the burden of proving, first, that juror misconduct occurred, and second, that there was a reasonable probability of resulting prejudice." *Taffner v. State*, 2018 Ark. 99, at 14, 541 S.W.3d 430, 438. "[T]his court has repeatedly held that the issue of witness credibility is for the trial judge to weigh and assess. Accordingly, this court will defer to the superior position of the trial court to evaluate the credibility of witnesses." *Cherry*, 341 Ark. at 931, 20 S.W.3d at 358 (internal citations omitted).

We are unpersuaded by Harris's reliance on *Cherry*. In *Cherry*, Cherry did not assert that the jury was presented with extraneous information after formal deliberations had begun; rather, the issue involved an allegation that jurors discussed the case amongst themselves throughout the trial. *Id.* at 929, 20 S.W.3d at 357. Further, in *Cherry*, jurors admitted discussing the facts of the case, as well as the evidence, prior to formal deliberations, and the circuit court therefore made a finding of prejudice because of those premature discussions. *Id.* at 927–33, 20 S.W.3d at 356–60. Here, given that the testimony was related to commentary made amongst the jurors during formal jury deliberations, the circuit court limited the scope of the posttrial hearing to first determine whether extraneous information had been brought to the jury's attention before making a determination about prejudice. The circuit court ultimately did not reach the issue of prejudice as it did in *Cherry* because it made a credibility determination that no extraneous information had been presented to the jury in the first place. Accordingly, *Cherry* is not on point.

Based on our review of the record before us, the circuit court did not clearly err in making a credibility determination upon hearing the testimony of the jurors and the bailiff and therefore did not abuse its discretion by denying Harris's motion for a new trial. The circuit court considered testimony from witnesses to determine whether juror misconduct had occurred during jury deliberations. The bailiff denied providing information about Renaldre's sentence to any jurors, and the testimony of the jurors was inconclusive as to when the alleged comment was made, who made the alleged comment, and what information was shared with the jury. Therefore, we affirm the circuit court.

21

## E. Prosecutorial Misconduct

For his final point on appeal, Harris contends that the State's remarks during closing arguments rose to the level of prosecutorial misconduct and that the circuit court did not properly intervene. Specifically, Harris asserts that the State attempted to shift the burden of proof by stating that "[t]he Defense told you a lot of things that they didn't prove to you, they didn't give you evidence of." Harris concedes that he did not make a contemporaneous objection at trial and therefore that this issue is not preserved for our review. However, Harris asserts that the third exception identified in *Wicks v. State*, 270 Ark. 781, 606 S.W.2d 366 (1980), requires us to undertake this review.

The State responds that the third *Wicks* exception does not apply to the present case because the exception is applied very narrowly. Relying on *Chunestudy v. State*, 2012 Ark. 222, 408 S.W.3d 55, the State points out that we have previously refused to apply the exception to potential prosecutorial errors during closing arguments. We agree with the State that the third *Wicks* exception does not apply.

We have recognized four narrow exceptions to the contemporaneous-objection rule that are to be rarely applied, commonly referred to as the *Wicks* exceptions. *Anderson v. State*, 353 Ark. 384, 398, 108 S.W.3d 592, 599 (2003). These exceptions are applied "when (1) a trial court, in a death-penalty case, fails to bring to the jury's attention a matter essential to its consideration of the death penalty itself; (2) a trial court errs at a time when defense counsel has no knowledge of the error and thus no opportunity to object; (3) a trial court should intervene on its own motion to correct a serious error; and (4) the admission or

22

exclusion of evidence affects a defendant's substantial rights." *Bradley v. State*, 2013 Ark. 58, at 15, 426 S.W.3d 363, 372. We have held that the third *Wicks* exception should be applied "when the error is so flagrant and so highly prejudicial in character as to make it the duty of the court on its own motion to have instructed the jury correctly." *Anderson*, 353 Ark. 395, 108 S.W.3d at 599.

Here, a review of the record demonstrates that the third *Wicks* exception does not apply to Harris's case, and we affirm the circuit court.

III. *Rule 4-3(a) Review*

Pursuant to Arkansas Supreme Court Rule 4-3(a), the record has been reviewed for all objections, motions, and requests that were decided adversely to Harris, and no prejudicial error was found.

Affirmed.

*Omar F. Greene*; and *Law Office of Fraser & Furrer, PLLC*, by: *Maryann Furrer*, for appellant.

*Leslie Rutledge*, Att'y Gen., by: *Christian Harris*, Sr. Ass't Att'y Gen.; and *Walker K. Hawkins*, Ass't Att'y Gen., for appellee.