Cite as 2025 Ark. 24

# SUPREME COURT OF ARKANSAS

No. CR–24–97

|  |  |  |
|---|---|---|
|  |  | **Opinion Delivered:** March 20, 2025 |
| JUSTIN MAYS | | |
| | APPELLANT | |
| V. | | APPEAL FROM THE PULASKI COUNTY CIRCUIT COURT [NO. 60CR–21–3881] |
| STATE OF ARKANSAS | | |
| | APPELLEE | HONORABLE KAREN D. WHATLEY, JUDGE |
| | | AFFIRMED. |

**KAREN R. BAKER, Chief Justice**

On June 28, 2023, Appellant Justin Mays was convicted by a Pulaski County Circuit Court jury of capital murder, two counts of terroristic act, and one count of first-degree battery. Mays was sentenced to life imprisonment without parole for the capital-murder conviction and ten years' imprisonment for each of the remaining convictions, to be served concurrently with his life sentence. He also received four 10-year-sentence enhancements for the use of a firearm during the commission of the crimes, with the enhancements to run concurrently with each other. As a result, Mays received an aggregate sentence of life imprisonment plus ten years. On appeal, Mays challenges the sufficiency of the evidence as

to each conviction.[1] Because this case involves a sentence of life imprisonment, jurisdiction is properly in this court pursuant to Arkansas Supreme Court Rule 1-2(a)(2). We affirm.

On October 14, 2021, Mays was charged with capital murder, two counts of terroristic act, and one count of first-degree battery.[2] A jury trial was held on June 27–28, 2023. At trial, Arkansas State Police Trooper Andrew Stovall testified that at approximately 2:20 a.m. on August 21, 2021, he responded to the scene of a shooting on Interstate 40. When Trooper Stovall arrived at the scene, he pulled up behind a red Ford Mustang with its flashers on. He observed bullet holes along the side of the vehicle. In the backseat of the Mustang, a young male, Kindelyn Roberts, was slumped over, and Trooper Stovall believed him to be deceased. Roberts was transported to the hospital and was pronounced dead. Quinn Lockhart, the driver of the Mustang, and Freangelo Dosty, a passenger, were present when Trooper Stovall arrived at the scene. Trooper Stovall testified that he did not observe any guns inside the Mustang or on Lockhart and Dosty. While on the scene, Trooper Stovall heard over the police radio that the possible suspect was driving a black Dodge Charger with "Dodge" written on the windshield.

Arkansas State Police Trooper Jacob Byrd testified that he was informed that a vehicle matching the Charger's description had dropped someone off at Baptist Health Hospital in Conway. Trooper Byrd went to the emergency-room entrance where he located the

---

[1]When Mays's appeal was initially before us, the jury-verdict forms were not included in the record of the proceedings. On October 24, 2024, we remanded the case to settle and supplement the record. See Mays v. State, 2024 Ark. 160 (per curiam). On November 7, a supplemental record containing the necessary verdict forms was filed.

[2]Mays was also charged with being a felon in possession of a firearm; however, this charge was nolle prossed.

unoccupied Charger. He was ultimately able to identify Ty-Shun Hughes as the driver of the Charger and one of the passengers as Mays. Hughes and Mays were then detained and separated.

Hughes testified that on the night of the shooting, he, Mays, Dalvin Howard, and Corey Allen went to a party at the Willow Event Center. Hughes drove them in his black Charger. Hughes testified that while the group was in the parking lot outside the party, he and Mays saw a red Mustang drive by. Hughes testified that "they was talking, saying them might be the guys they into it with and stuff like that." Hughes, Mays, Howard, and Allen left the parking lot and went to a gas station where they saw the Mustang again. At this point, Hughes was still the driver of the Charger, Mays was the front passenger, Howard was in the backseat behind Hughes, and Allen was in the backseat behind Mays. When the Mustang pulled out of the gas-station parking lot, Mays told Hughes to follow them. As Hughes sped up to pass the Mustang, which was in the left lane, he heard gunshots and bullets hitting the top of his vehicle. Hughes identified Mays as the shooter, explaining that Mays was hanging out of the front-passenger window while firing his Glock with an extension clip. Hughes then heard Howard say that he had been shot.[3] Hughes testified that he took the first exit and went to the hospital. Once they arrived at the hospital, Howard and Mays got out of the Charger. Hughes then left to pick up Mays's mother. Hughes testified that once he arrived back at the hospital with Mays's mother, he was detained by police and taken to the state police headquarters.

---

[3]The record demonstrates that Howard sustained an injury to his eye area.

Arkansas State Police Sergeant Ryan Jacks testified that he responded to the scene and took pictures of the Mustang. Sergeant Jacks testified that the Mustang's front right tire was flat, there were numerous bullet holes on the right-passenger side of the vehicle, the right-passenger-side window was shattered, and the front windshield had a bullet hole in it. As depicted in the photographs admitted at trial and through Sergeant Jacks's testimony, there was a total of seventeen bullet strikes to the Mustang. There were no apparent bullet holes to the driver's side of the Mustang. With regard to the interior of the Mustang, Sergeant Jacks testified that there was a bullet hole in the front-passenger headrest and projectiles were located in the rear floorboard, the rear seat, the engine compartment, and the trunk. Sergeant Jacks noted that there were bullet holes in the sidewall in the area where Roberts had been sitting as well as blood stains in his seat.

Sergeant Jacks also inspected the Charger, and he noted bullet holes in the roof of the vehicle and blood in the driver's-side back seat. Sergeant Jacks testified that the evidence showed that a bullet that penetrated the roof of the vehicle had fragmented and caused Howard's injury. Based on the angle of the ballistic rods placed into the bullet holes, Sergeant Jacks opined that the shooter shot from the front-passenger side of the Charger. Sergeant Jacks testified that he interviewed Mays, Hughes, Lockhart, and Dosty. Mays's interview was played for the jury. Mays admitted that he was the front-seat passenger of the Charger when Howard was shot. However, he denied firing at the Mustang or that there were firearms in the Charger. Instead, Mays stated that the Mustang followed them from the party and began shooting at the Charger, striking Howard.

4

Arkansas State Police Special Agent Gregg Bray testified as an expert in bullet trajectory. Special Agent Bray testified that in this case, he helped photograph and analyze bullet holes in the Charger. From his visual inspection and the use of probes placed in the bullet holes, he determined that a firearm had been shot from the right-front side of the vehicle.

Lieutenant Andrew Burningham with the Conway Police Department testified that he retrieved information from a license-plate reader located on Dave Ward Drive in Conway shortly before the shooting. The report generated by the license-plate reader revealed that the Mustang was heading toward Interstate 40 at 2:08 a.m. on August 21, 2021, and that the Charger passed by the same reader approximately four seconds later.

Benjamin Fields, an access-identity-system specialist at Baptist Hospital in Conway, testified that the Arkansas State Police asked him to pull surveillance from August 21, 2021. The video was played for the jury and showed the Charger pulling up to the emergency room. Mays then exited the vehicle from the front-passenger seat, ran to the back of the vehicle to help Howard, and escorted Howard into the hospital.

Dr. Adam Craig, a forensic pathologist at the Arkansas State Crime Laboratory, testified that he performed an autopsy on Roberts. Dr. Craig testified that Roberts died as a result of gunshot wounds to his torso and right arm.

Mays was found guilty of capital murder as to Roberts, terroristic act against Lockhart, terroristic act against Dosty, and first-degree battery against Howard. Mays waived jury sentencing, and he was sentenced as set forth above. This timely appeal followed.

I. *Standard of Review*

5

In reviewing a challenge to the sufficiency of the evidence, we view the evidence in the light most favorable to the State and consider only the evidence that supports the verdict. *Edmond v. State*, 351 Ark. 495, 95 S.W.3d 789 (2003). We will affirm a conviction if there is substantial evidence to support it. *Id.* Substantial evidence is that which is of sufficient force and character that it will, with reasonable certainty, compel a conclusion one way or the other, without resorting to speculation or conjecture. *Dortch v. State*, 2018 Ark. 135, at 5, 544 S.W.3d 518, 522. This court does not weigh the evidence presented at trial or assess the credibility of the witnesses because those are matters for the fact-finder. *Drennan v. State*, 2018 Ark. 328, at 6, 559 S.W.3d 262, 266. The trier of fact is free to believe all or part of any witness's testimony and may resolve questions of conflicting testimony and inconsistent evidence. *Id.* Further, circumstantial evidence may provide a basis to support a conviction, but it must be consistent with the defendant's guilt and inconsistent with any other reasonable conclusion. *Edmond*, 351 Ark. 495, 95 S.W.3d 789. Whether the evidence excludes every other hypothesis is left to the jury to decide. *Carmichael v. State*, 340 Ark. 598, 12 S.W.3d 225 (2000).

II. *Arguments on Appeal*

A. Capital Murder

First, Mays argues that the State failed to provide substantial evidence that Mays, or an accomplice, caused the death of Roberts. Specifically, Mays argues that while there was circumstantial evidence that a firearm had been fired from the Charger, the State failed to provide substantial evidence that Mays fired a weapon from the vehicle, or that he aided or promoted another person to fire a weapon from the vehicle.

A person commits capital murder if "[t]he person . . . [p]urposely discharges a firearm from a vehicle at a person or at a vehicle . . . that he or she knows or has good reason to believe to be occupied by a person; and . . . [t]hereby causes the death of another person under circumstances manifesting extreme indifference to the value of human life." Ark. Code Ann. § 5-10-101(a)(10) (Supp. 2021). A person acts as an accomplice of another person in the commission of an offense if, with the purpose of promoting or facilitating the commission of an offense, the person "[s]olicits, advises, encourages, or coerces the other person to commit the offense" or "[a]ids, agrees to aid, or attempts to aid the other person in planning or committing the offense[.]" Ark. Code Ann. § 5-2-403(a)(1)–(2) (Repl. 2013). Relevant factors in determining the connection of an accomplice to a crime are the presence of the accused in proximity to a crime, the opportunity to commit the crime, and an association with a person involved in a manner suggestive of joint participation. *Gilcrease v. State*, 2009 Ark. 298, at 12, 318 S.W.3d 70, 79. We have said that there is no distinction between principals on the one hand and accomplices on the other, insofar as criminal liability is concerned. *Price v. State*, 2019 Ark. 323, 588 S.W.3d 1. When two people assist one another in the commission of a crime, each is an accomplice and criminally liable for the conduct of both. *Id.*

A conviction may not be had in a felony case upon the testimony of an accomplice unless corroborated by other evidence tending to connect the defendant with the commission of the offense. *See* Ark. Code Ann. § 16-89-111(e)(1)(A) (Supp. 2023). The corroboration is insufficient if it merely shows that the offense was committed and the circumstances of the offense. Ark. Code Ann. § 16-89-111(e)(1)(B). Corroboration must

7

be evidence of a substantive nature, since it must be directed toward proving the connection of the accused with the crime, and not directed toward corroborating the accomplice's testimony. *MacKool v. State*, 365 Ark. 416, 430, 231 S.W.3d 676, 688 (2006). Circumstantial evidence may be used to support accomplice testimony, but it, too, must be substantial. *Id.* Corroborating evidence need not, however, be so substantial in and of itself to sustain a conviction. *Id.* Rather, it need only, independently of the testimony of the accomplice, tend in some degree to connect the defendant with the commission of the crime. *Id.*

We turn to the testimony presented. In evaluating whether substantial evidence supports the jury's finding that either Mays or an accomplice committed capital murder, we review the evidence in the light most favorable to the State. The driver of the Charger, Hughes, testified that Mays told him to pass the Mustang, and as he did so, Mays hung out of the front-passenger window and fired his gun at the Mustang. Hughes's testimony was corroborated by Mays's own testimony admitting that he was sitting in the front-passenger seat of the Charger at the time of the shootings. Photographs introduced at trial revealed that there were seventeen bullet strikes along the passenger side of the Mustang. Sergeant Jacks and Special Agent Bray testified that based on ballistic evidence, the firearm was shot from the front-passenger side of the Charger. Further, the report from the license-plate reader corroborated Hughes's testimony that the Charger was following closely behind the Mustang as they merged onto Interstate 40. These facts show that there was substantial evidence presented at trial that Mays was the shooter or the shooter's accomplice in Roberts's death. Stated differently, sufficient evidence supports Mays's capital-murder conviction, and the circuit court did not err in denying his motion for directed verdict.

## B. Terroristic Act

Mays next argues that the State failed to provide substantial evidence that either Mays or an accomplice fired a weapon at the Mustang that was occupied by Lockhart and Dosty.

A person commits a terroristic act if, while not in the commission of a lawful act, the person "[s]hoots at or in any manner projects an object at a conveyance which is being operated or which is occupied by another person with the purpose to cause injury to another person or damage to property[.]" Ark. Code Ann. § 5-13-310(a)(1) (Repl. 2013). As set forth above, there was substantial evidence presented at trial to prove that Mays as the shooter or an accomplice purposely shot multiple times at the Mustang that was occupied by Lockhart and Dosty. Based on these facts, we hold that substantial evidence supports Mays's terroristic-act convictions, and the circuit court did not err in denying his motions for directed verdict.

## C. First–Degree Battery

For his final argument on appeal, Mays argues that the State failed to provide substantial evidence that Mays acted with the purpose of causing physical injury to another person and that he injured Howard. Specifically, Mays argues that while there is no dispute that Howard was injured by a firearm, there was insufficient proof to determine that Mays fired a weapon from the vehicle or that he aided or promoted another person in firing a weapon from the vehicle.

A person commits first-degree battery if, with the purpose of causing physical injury to another person, the person causes physical injury to any person by means of a firearm. Ark. Code Ann. § 5-13-201(a)(8) (Repl. 2023). As set forth above, Hughes testified that

9

Mays was hanging out of the passenger-side window and firing his gun at the Mustang. While Mays attempted to cause injury to the occupants of the Mustang, bullets hit the roof of the Charger and one of the fragments entered the vehicle and caused injury to Howard. Accordingly, there was substantial evidence presented at trial to prove that either Mays or an accomplice fired a gun toward the Mustang and, as a result, injured Howard. In light of these facts, we hold that substantial evidence supports Mays's first-degree-battery conviction, and the circuit court did not err in denying his motion for directed verdict.

Pursuant to Arkansas Supreme Court Rule 4-3(a), the record has been reviewed for all objections, motions, and requests that were decided adversely to Mays, and no prejudicial error has been found.

Affirmed.

Special Justice MARK ALLISON joins.

BRONNI, J., not participating.

*James Law Firm*, by: *William O. "Bill" James, Jr.*; and *Drew Curtis*, for appellant.

*Tim Griffin*, Att'y Gen., by: *Michael Zangari*, Ass't Att'y Gen., for appellee.

10