SLIP OPINION

Cite as 2017 Ark. 106

# SUPREME COURT OF ARKANSAS

No. CR-16-719

| | |
|---|---|
| DANIEL CURTIS JOHNSON<br>APPELLANT | **Opinion Delivered** March 30, 2017 |
| V. | APPEAL FROM THE MISSISSIPPI<br>COUNTY CIRCUIT COURT,<br>CHICKASAWBA DISTRICT<br>[NO. 47CR-15-326] |
| STATE OF ARKANSAS<br>APPELLEE | HONORABLE MELISSA BRISTOW<br>RICHARDSON, JUDGE |
| | AFFIRMED. |

**KAREN R. BAKER, Associate Justice**

On April 20, 2016, a Mississippi County Circuit Court jury convicted appellant, Daniel Curtis Johnson, of first-degree murder and found that he had used a firearm in the commission of that murder.[1]  Johnson was sentenced to life imprisonment and fifteen years' imprisonment for the firearm enhancement to run consecutively. Johnson's conviction and sentences stem from the June 22, 2015 death of Vincent Stone at or near a basketball court in Williams Park in Blytheville, Arkansas. At trial, Blytheville Police Officer, Carl Lee Treadway, testified that on the day of the incident, he responded to a 911 call that shots had been fired at Williams Park.  Officer Treadway testified that he had driven through the park minutes before receiving the call and estimated that approximately 80 people were present,

---

[1]Daniel Johnson is referred to in the record by several names: Daniel Johnson, D'Nasty Johnson, D'ynasty Johnson, Dynasty Johnson and Dy'nasty Johnson.

enjoying the park and playing basketball. The State called Jimmy Aldridge, Jr., and Chardrick Mitchell as witnesses. Both men testified that they were playing basketball at the park with Stone on the day of the incident and a large group of people were at the park. Aldridge and Mitchell also testified that after they finished their game and were leaving the basketball court with Stone, two men came up from behind Stone and shot Stone multiple times. Aldridge and Mitchell both identified Johnson at trial as one of the assailants. Johnson was convicted and sentenced as described above.

After the trial, pursuant to Rule 33.3(b) (2016), on May 11, 2016, Johnson filed a motion for new trial following the discovery of two Facebook posts created by Aldridge and Mitchell. On May 13, 2016, the circuit court conducted a hearing on the motion for new trial and on that same day denied the motion. From that order, Johnson appeals. Johnson does not challenge the sufficiency of the evidence and presents one issue: whether the circuit court erred in denying his motion for new trial.

## I. *Motion for New Trial*

For his sole point on appeal, Johnson asserts that the circuit court erred when it denied his motion for new trial.[2] "The decision whether to grant a new trial is left to the sound discretion of the trial court, and it is not reversed in the absence of an abuse of discretion or manifest prejudice to the complaining party." *McIntosh v. State*, 340 Ark. 34, 41, 8 S.W.3d 506, 510 (2000) (internal citations omitted). To prevail on a motion for new trial

---

[2]Based on the record before us, because Johnson has abandoned his argument regarding the Facebook post by Mitchell, we address only the motion for new trial with regard to Aldridge's Facebook post.

SLIP OPINION

based on newly discovered evidence, the movant "must show that the new evidence would have impacted the outcome of his case, and that he used due diligence in trying to discover the evidence." *Wilcox v. State*, 342 Ark. 388, 394, 39 S.W.3d 434, 438 (2000). "A trial court's factual determination on a motion for a new trial will not be reversed unless clearly erroneous." *State v. Cherry*, 341 Ark. 924, 928, 20 S.W.3d 354, 357 (2000).

We have recognized that newly discovered evidence is one of the least favored grounds to justify granting a new trial. *Williams v. State*, 252 Ark. 1289, 482 S.W.2d 810 (1972). A new trial will not be granted because of perjury on an immaterial issue, or on a collateral issue, nor generally where the false testimony may be eliminated without depriving the verdict of sufficient evidentiary support. *Bennett v. State*, 307 Ark. 400, 404, 821 S.W.2d 13, 15 (1991). Further, newly discovered evidence that relates only to the impeachment of a witness does not afford grounds for a new trial. *Hayes v. State*, 169 Ark. 883, 886, 277 S.W. 36, 37 (1925); *Whittaker v. State*, 173 Ark. 1172, 1176, 294 S.W. 397, 399 (1927) ("It is the general rule of practice in this court not to reverse the ruling of the trial court in refusing a new trial on the ground of newly discovered evidence where such evidence tends merely to impeach the credibility of witnesses."); *Taylor v. State*, 299 Ark. 123, 126, 771 S.W.2d 742, 744 (1989) ("Evidence which only attacks the credibility of other testimony is not grounds for a new trial. *Williams v. State*, 289 Ark. 69, 709 S.W.2d 80 (1986); *Orsini v. State*, 281 Ark. 348, 665 S.W.2d 245, *cert. denied*, 469 U.S. 847 (1984)"). Finally, "[t]he mere fact that the purported evidence would be contradictory to that offered at the trial by the State is insufficient. It must also be shown that, because of the proffered evidence, a different

SLIP OPINION

result upon a new trial is probable." *Gross v. State*, 242 Ark. 142, 147, 412 S.W.2d 279, 283 (1967) (internal citations omitted).

With these standards in mind, we turn to Johnson's argument on appeal. At trial, Aldridge testified that he and Stone had been playing basketball, just lost their game, and were walking off the court when Johnson and another man approached them. Aldridge testified that in broad daylight, in a "packed" park, without saying anything, the two men walked up and both shot Stone:

| | |
|---|---|
| ALDRIDGE: | We were just playing ball. . . . Me and Vincent [Stone] we were talking, talking to one another . . . Daniel [Johnson] popped up. |
| | He had a blue hoodie on. . . . [He] was shooting, pointing [a] gun . . . at [Vincent Stone]. Came on the court, shot him. . . . Broad daylight. |

Aldridge went on to testify that Johnson wore dreads in his hair and had a black pistol and identified Johnson as the shooter.

| | |
|---|---|
| THE PROSECUTOR: | And you said [Johnson] . . . had [a] hoodie on. How were you able to see who . . . [he] was? |
| ALDRIDGE: | Because, actually, you know, the hood, D'Nasty's hood – – |
| THE PROSECUTOR: | You are talking about Daniel Johnson. |
| ALDRIDGE: | Yeah, Daniel Johnson. You know, his braids was in the way. That's how I actually – – his hood fell off too, you know what I'm saying? The hood fell off. |

Also at trial, Aldridge testified that immediately after the shooting he spoke with Officer Middlebrook of the Blytheville Police Department at the hospital and identified

Johnson as the shooter. Aldridge further testified that on July 27, 2015, he provided a written statement to law enforcement wherein he also identified Johnson as the shooter. Finally, at trial, Aldridge was cross-examined regarding his eyewitness account of the shooting and his identification of Johnson.

Next, two weeks after the trial at the hearing on Johnson's motion for new trial, Johnson asserted that he was entitled to a new trial and to deny his motion "would be a manifest injustice to [Johnson]. We've got some . . . Facebook postings . . . that impeach one witness fairly well and at least show a bias in another witness, that I think might have helped in this trial from the beginning." At the hearing, Johnson's sister, Latrice Johnson, testified that approximately two weeks after Johnson's trial, an anonymous person sent Latrice a Facebook post made by Aldridge regarding Stone's murder, which she shared with defense counsel. Latrice testified that the Facebook post was made on June 28, 2015, six days after the shooting, and she confirmed the Facebook post by checking Aldridge's Facebook page. The post stated in its entirety:

> Real niggas cry! Got me crying like a baby! Lost my nigga right in front of me! Couldn't do shit!! It was to [sic] many people out there for nobody to see anything!! My nigga can't rest in peace until justice is served!! 6/22/15 real nigga holiday!!!

At the hearing, Aldridge testified that his Facebook post was consistent with his trial testimony regarding witnessing the shooting and in his identification of Johnson as the shooter. On cross-examination, the following colloquy occurred:

THE PROSECUTOR: You remember - - you're the one that made that - - you identified Mr. Johnson as the shooter of Vincent Stone.

Cite as 2017 Ark. 106

ALDRIDGE:                   Yes, sir.

THE PROSECUTOR:        Okay.  Now, and if you recall correctly, you were extensively cross-examined about that that day; right?

ALDRIDGE:                   Yes, sir.

THE PROSECUTOR:        Okay. Now, you also testified about there being a bunch of folks out there; correct?

ALDRIDGE:                   Yes, sir.

THE PROSECUTOR:        Okay.  Now, do you recall there being any questions about how many people were out there and how only two came forward? Do you recall testimony about that?

ALDRIDGE:                   Yes, sir.

[The Prosecutor hands Aldridge the Facebook post]

THE PROSECUTOR:        Can you identify what that is I've handed you, Mr. Aldridge?

ALDRIDGE:                   Basically, saying like I said, I seen my homeboy be killed in front of me right there.  But I'm the only one going to the police about it.  I'm calling Mr. Walker, has anyone else come up.  No.  No. Nobody came up.  So, June 28th I made a Facebook status like all these people out here, and I'm the only one that's, you know, pushed the issue to say something.  He's on Snapchat threaten[ing] other people, so I guess they were scared to say something.

THE PROSECUTOR:        So by that – – what did you mean by that post? What exactly did you mean?

. . . .

6

ALDRIDGE: What I mean by this, I saw Vincent killed in front of me. It was so many people out there. I am one of the only ones to stand up.

THE PROSECUTOR: So not – – by that post you're not meaning to say, "Nobody saw anything. I wish I knew who did it."

ALDRIDGE: I was being sarcastic.

THE PROSECUTOR: You're saying "How were all these people out here and nobody saw anything. How am I the only one coming forward?"

ALDRIDGE: Right.

. . . .

ALDRIDGE: . . . I did . . . say, I lost my homeboy right in front of me. Right in front of me. Like he was right there. I seen everything.

THE PROSECUTOR: And do you recall testifying to that fact at trial?

ALDRIDGE: Yes, sir.

. . . .

THE PROSECUTOR: And is there anything about that post that takes away from the truth of your statement that day?

ALDRIDGE: No, sir.

THE PROSECUTOR: . . . Is there anything in that post that wasn't already testified to at the trial?

ALDRIDGE: No, sir.

At the close of the hearing, the circuit court denied Johnson's motion and explained,

     With regard to Defendant's Exhibit #2, which is the Facebook post of Jimmy Aldridge, again the Court finds that this Facebook post of Mr. Aldridge

does not in any fashion establish or suggest perjury on any material issue at trial.

The Court finds that in this Facebook post Mr. Aldridge did not state that he did not see who shot Vincent Stone. That is not what it says. Instead, it states, "It was too many people out there for nobody to see anything." That statement, the Court does not consider it to be a fair reading of that statement to suggest that he was stating that he did not see anything, but rather, a fair reading of that Facebook post can be read consistently with Mr. Aldridge's testimony at the trial that he did see it, there were other people present, and despite there being other people present at the time two people alone – Mr. Aldridge and Mr. Mitchell – were the only two people who came and testified to this jury as to what they saw.

That issue, the fact that other people were present and that Mr. Aldridge and Mr. Mitchell were the two that testified at trial, that was argued to the jury by the defense as a reason for disbelieving those two eyewitnesses. The jury has heard argument or did hear argument along those lines.

I find that presentation of Defendant's Exhibit #2 does not warrant a new trial. Further, Mr. Aldridge was cross-examined aggressively on credibility issues. I am not persuaded that the presentation to the jury of this Facebook post would have altered the outcome of the trial, and I am not persuaded that this would have even constituted persuasive impeachment evidence; but at best, it is additional cumulative impeachment evidence that is substantially insufficient basis for granting a new trial.

Here, Johnson contends that the circuit court erred in denying his motion for new trial asserting that the Facebook post demonstrates that Aldridge did not witness the shooting and was not aware who the shooter was. In other words, Aldridge's post was newly discovered evidence that stated Aldridge did not actually witness what happened at the park on the night of the incident. Johnson further asserts that if the jury had Aldridge's Facebook post, the jury may have come to an opposite conclusion as to the credibility of Aldridge and acquitted Johnson. In sum, Johnson contends that this evidence would have materially changed the outcome of Johnson's trial in his favor had the evidence been available to the

jury because it demonstrates that Aldridge did not witness the shooting.

Relying on *Bussey v. State*, 69 Ark. 545, 64 S.W. 268 (1901), and *Bennett v. State*, 307 Ark. 400, 821 S.W.2d 13 (1991), Johnson urges us to reverse the circuit court. In *Bussey*, we reversed the denial of a motion for new trial after the victim provided a sworn recantation the day after the trial. Here, Aldridge's Facebook post is not a recantation of his testimony about the shooting or of his identification of Johnson as the shooter. In *Bennett*, we held that a new trial should have been granted because of material perjured testimony from an undercover law enforcement officer where the officer provided false testimony regarding her romantic relationship with Bennett. Accordingly, in *Bennett*, the newly discovered evidence was based on the undercover narcotics officer's relationship with Bennett, which is not an issue in Johnson's case.

Here, based on our standard of review and the record before us, we agree with the circuit court that the post would not have impacted the outcome of his case. Prior to trial, Aldridge stated in conversations with law enforcement and in a written statement to law enforcement, that he had witnessed the shooting and had identified Johnson as one of the shooters. Further, at trial, Aldridge consistently testified that he had witnessed the shooting, and identified Johnson as the assailant. At the motion-for-new-trial hearing, Aldridge again testified to the same and explained that his post was a sarcastic comment stating, "How were all these people out here and nobody saw anything. How am I the only one coming forward?" The record demonstrates that the testimony from multiple witnesses was that there was a large crowd there that evening, and Aldridge and Mitchell were the only witnesses to

come forward. Reading the statement as a whole, Aldridge's comment was a reaction to the specific facts of this case and not a recantation of testimony. Further, Aldridge was cross-examined about the post and clearly stated that he had witnessed the shooting; he identified Johnson and did not waver from his testimony. The evidence could have possibly been used to attempt to impeach Aldridge, which, as discussed above, does not satisfy our standard for newly discovered evidence.

Accordingly, based on the record before us, we cannot say that Johnson has met his burden and demonstrated that the circuit court erred. Therefore, based on our discussion above and our standard of review, we do not find error and affirm the circuit court.

In compliance with Arkansas Supreme Court Rule 4–3(i), the record has been examined for all objections, motions, and requests made by either party that were decided adversely to Johnson, and no prejudicial error has been found.

Affirmed.

*John H. Bradley*, Chief Public Defender, for appellant.

*Leslie Rutledge*, Att'y Gen., by: *Valerie Glover Fortner*, Ass't Att'y Gen., for appellee.