Cite as 2024 Ark. 49

# SUPREME COURT OF ARKANSAS
No. CR–23–602

| | | |
|---|---|---|
| | | **Opinion Delivered:** April 11, 2024 |
| LEASHEBIA DAVIS | APPELLANT | APPEAL FROM THE JEFFERSON COUNTY CIRCUIT COURT [NO. 35CR-20-351] |
| V. | | HONORABLE ROBERT H. WYATT, JR., JUDGE |
| STATE OF ARKANSAS | APPELLEE | AFFIRMED. |

**KAREN R. BAKER, Associate Justice**

On May 17, 2023, a Jefferson County Circuit Court jury convicted appellant, Leashebia Davis, of capital murder, for which she was sentenced by the circuit court to a term of life imprisonment without the possibility of parole.[1] On appeal, Davis presents two points: (1) there was insufficient evidence to support Davis's capital-murder conviction; and (2) the circuit court erred in denying Davis's motion for new trial based on juror misconduct. We affirm.

---

[1]The jury also found that Davis had employed a firearm as a means of committing the charged offense in accordance with Arkansas Code Annotated section 16-90-120. However, on June 5, 2023, the circuit court entered an order explaining that "as a result of the [mandatory] Life Without Parole sentence on the underlying charge, no additional sentence was imposed on the Enhancement."

This appeal stems from the shooting death of Elvis Kendal on May 4, 2020. On July 1, 2020, Davis was charged with capital murder. On May 16–17, 2023, Davis's jury trial was held. The record before us establishes the following facts.

## I. *Facts and Procedural History*

On Monday, May 4, 2020, law enforcement officers with the Pine Bluff Police Department ("PBPD") were dispatched to the scene of a shooting near 33rd Avenue and Hazel Street where they observed Kendal lying on the ground near his white Cadillac CTS. Kendal was transported to a nearby hospital where he ultimately succumbed to his injuries during surgery. Jimmiesha Palmer, a crime scene technician with the PBPD, testified that four shell casings were recovered at the scene near Kendal's vehicle and there was what appeared to be a bullet hole in the back passenger door on the driver's side of the vehicle.

Natasha Gill, Kendal's cousin, testified that she lived near the scene of the shooting, and on May 4, she was keeping an eye on her nieces and cousins who were riding their bicycles outside when she observed Kendal turn the corner onto 33rd Avenue in his white Cadillac. Gill testified that she went back inside and, shortly thereafter, she heard four or five gunshots and saw that a black Jeep that had pulled up beside Kendal's vehicle was driving away. Gill testified that Kendal had been sitting in his vehicle, and after she heard the gunshots, she observed him get out, walk toward the back of his vehicle, and collapse to the ground. Gill testified further that she ran to the scene and attempted to render aid to Kendal, but upon seeing a vehicle resembling the black Jeep returning, she fled and called 911.

By Wednesday, May 6, Davis had been identified as a suspect in the investigation. Law enforcement sought to locate Davis, and Detective Corey Wilfong with the PBPD,

2

lead investigator in the case, testified that he learned that Davis was believed to be with an individual named Erica Heard. Detective Steven Rucker with the PBPD testified that, on May 6, he and Lieutenant Marcus Smith located Heard's vehicle and conducted a traffic stop. Detective Rucker testified that he approached the passenger side of the vehicle, the passenger identified herself to be Davis, and he ordered her to step out of the vehicle. Before Davis exited the vehicle, Detective Rucker testified that she reached across the center console and picked up a bag, handed it to Heard, and said something to the effect of "hold on to this." Detective Rucker testified that he was given authorization to search the bag, at which point he discovered a Ruger LCP LaserMax .380-caliber handgun inside. Heard testified that both the bag and the handgun belonged to her and that she had lent the gun to Davis over the weekend at Davis's request. Later that day, Davis was Mirandized before giving a brief statement to Detective Wilfong. Davis told Detective Wilfong that she had been arguing with Kendal on May 4 because Kendal had allegedly struck her fourteen-year-old son earlier that day. After Davis provided her statement, she was taken into custody.

Detective Wilfong testified that, after Davis was taken into custody, a search warrant was executed on her apartment, during which a green shirt was collected as evidence. Detective Wilfong testified further that he subsequently obtained surveillance-video footage of the events leading up to the shooting on May 4 from the Superstop gas station located near the scene of the shooting. The footage, which was played for the jury, showed Kendal's vehicle turning out of the gas station parking lot onto Hazel Street and heading toward 33rd Avenue. Shortly thereafter, the footage captured a black Jeep quickly approaching Kendal's vehicle from behind. Then, as the vehicles were driving out of frame of the surveillance

camera headed toward 33rd Avenue, a person wearing what appeared to Detective Wilfong to be the same green shirt recovered from Davis's apartment was seen hanging out of the front passenger window of the Jeep waving in the direction of Kendal's vehicle. Detective Wilfong testified that it appeared to him that the footage depicted a shooting.

In the course of the investigation, law enforcement learned that the black Jeep shown in the May 4 gas station surveillance-video footage, a Jeep Patriot, belonged to Davis's cousin, Robin Cones, and that Davis, Roderick Breedlove, and Michael Brazell had been the occupants of the vehicle. According to trial testimony, neither Breedlove nor Brazell had ever met Davis prior to that day. Cones had been living with Davis, and on May 4, Breedlove and Brazell dropped Cones off at Davis's apartment after Cones got off work so that she could take a shower. When they arrived, Davis asked for a ride to the store, and Breedlove, who was in a romantic relationship with Cones at the time, borrowed Cones's Jeep Patriot to give her a ride. Brazell joined Breedlove and Davis, and he sat in the back seat on the driver's side of the vehicle. What happened next was disputed at trial.

According to Breedlove, Davis's demeanor had been calm, but he noticed that Davis was holding a gun in her hand during the car ride. Breedlove testified that Davis was the individual seen hanging out of the front passenger window of the Jeep, but he could not see what was in her hand at that time because she had her back to him. Breedlove testified that, by coincidence, they drove up behind Kendal's vehicle on Hazel Street as he turned out of the gas station and that Kendal stopped his vehicle on 33rd Avenue and flagged the Jeep down. Breedlove testified further that Davis exited the vehicle and approached Kendal's vehicle where he had pulled over, and the two began arguing about the alleged encounter

he had with her teenage son earlier that day. Breedlove testified that, at some point during the argument, Brazell also exited the vehicle, took the gun away from Davis, and fired four shots at Kendal. At that time, Breedlove testified, both Davis and Brazell got back into the Jeep, and Breedlove drove away. Breedlove testified that he did not provide a statement about the shooting until he was approached by law enforcement on May 11. When confronted with the transcript of his statement, Breedlove denied having initially identified Davis as the person who pointed the gun.

According to Davis, she and Kendal had been in a romantic relationship at the time of the shooting, and the two argued frequently. Davis testified that they had been arguing on May 4 because she was angry that he had struck her fourteen-year-old son earlier that day. Davis admitted that she had brought a gun with her on her trip to the store that day and, contrary to Heard's testimony that Heard lent Davis the gun over the weekend, she claimed that she had borrowed the gun from Heard a week or two prior to May 4 because she was staying in a violent neighborhood and feared for her safety. Davis testified that she brought the gun with her on May 4 for protection. Davis testified that, on their way to the store, they had somehow ended up behind Kendal's vehicle. Davis testified that she was indeed the individual seen in the surveillance-video footage hanging out of the Jeep's front passenger window while the Jeep was driving behind Kendal's vehicle, but she stated that she did not recall why she had done so and denied having the gun in her hand at that time. Davis testified that they pulled up beside Kendal's vehicle when he turned onto 33rd Avenue, and her passenger-side window was facing the driver's-side window of Kendal's vehicle. Davis testified that, when they were side by side, she asked Kendal, "Why did you

hit my son?" Davis stated that Kendal became hostile and the two began arguing, which led her to pull the gun from her purse and inform Kendal that she was armed. Davis testified that, at that point, Brazell snatched the gun from her hand, jumped out of the Jeep, walked around to Kendal's vehicle, and shot Kendal in the back four times. Davis testified further that she put the gun back into her purse after the shooting. Contrary to Breedlove's testimony, Davis testified that she never got out of the vehicle.

According to Brazell, Davis was angry when she got into the Jeep that day. Brazell testified that, on their way to the store, Davis spotted Kendal's vehicle turning out of the gas station parking lot and leaned out of the Jeep's front-passenger window and began waving a gun around in an attempt to flag Kendal down. Brazell testified that when Kendal pulled his vehicle over on 33rd Avenue, they pulled up beside Kendal's vehicle, and he witnessed Davis fire three or four shots at Kendal while she remained in the Jeep. Brazell testified that he did not take the gun away from Davis, did not get out of the Jeep, and did not shoot Kendal. Brazell testified further that he did not provide a statement about the shooting until his parole officer contacted him more than a week after the incident, and he admitted having initially told law enforcement that he had not been involved.

Dr. Adam Craig, an associate medical examiner at the Arkansas State Crime Laboratory, testified that Kendal had sustained four gunshot wounds to his back, and that the gunshots had all traveled downward, moving from left to right and from back to front. Dr. Craig testified further that three bullets had been recovered during the autopsy. Rebecca Mullen, chief firearm and toolmark examiner at the Arkansas State Crime Laboratory, testified that the four shell casings found at the scene of the shooting had been fired from

6

the Ruger .380-caliber handgun that was seized during the May 6 traffic stop, and that the three bullets recovered by Dr. Craig during Kendal's autopsy had been fired through the barrel of that same handgun.

On May 17, 2023, Davis was convicted and sentenced as described above. The sentencing order was filed on June 5. On July 3, Davis filed a motion for a new trial pursuant to Arkansas Code Annotated section 16-89-130(c)(7) and Rule 33.3 of the Arkansas Rules of Criminal Procedure. Davis argued that juror misconduct had occurred when, during voir dire, one venireperson failed to disclose that her sister, Carla Jones, was the administrative assistant of the defense attorney, Garfield Bloodman. On July 24, the circuit court held a hearing on Davis's motion. Jones testified that her sister, Brittney Bradley, had informed her after Davis's trial was over that she had been a juror on the case but that they did not discuss the trial any further. Jones testified that she did not work on any paperwork or juror forms to help Bloodman prepare for Davis's trial and that she and Bloodman did not discuss the fact that her sister had been a juror until after the trial had concluded. Bloodman testified that Jones had collected discovery and the potential juror list in Davis's case but that she was not actively involved in the case because another individual was tasked with assisting him with trial preparation. Bloodman testified further that he did not know who Bradley was, nor had he ever spoken to her or performed legal services for her. Bloodman testified that he was not aware of any information that suggested that Bradley harbored any biases or prejudice in Davis's case.[2] The relevant juror questionnaire asked whether each potential

_____

[2]The hearing on Davis's motion was continued twice in an attempt to procure Bradley's testimony. However, Bradley ultimately did not testify.

juror was "related to, or a close personal friend of any law enforcement officer or attorney[,]" to which Juror Bradley answered no. During voir dire, the circuit court asked, "[Does] [a]nyone know Mr. Bloodman? Anybody represented by him currently? Anybody been sued by him recently?" A male venireperson indicated that he knew Bloodman, but no others disclosed any familiarity with him.

Davis argued that she was deprived of her right to a fair and impartial jury because Bradley failed to disclose that Jones, Bradley's sister, was employed by Bloodman at the time of Davis's trial. Davis asserted that this lack of candor deprived her of the ability to conduct further questioning or excuse Bradley from the jury. The State argued that venirepersons and jurors are presumed to be unbiased and qualified to serve, and it is then the burden of the movant to demonstrate bias. The State argued that Davis failed to rebut the presumption that Bradley was unbiased in light of Jones's and Bloodman's testimony. On July 31, the circuit court denied Davis's motion for a new trial.

This timely appeal followed.

II. *Points on Appeal*

A. Sufficiency of the Evidence

For her first point on appeal, Davis contends that there was insufficient evidence to support her capital-murder conviction. In reviewing a challenge to the sufficiency of the evidence, we view the evidence in the light most favorable to the State and consider only the evidence that supports the verdict. *Edmond v. State*, 351 Ark. 495, 95 S.W.3d 789 (2003). We will affirm a conviction if substantial evidence exists to support it. *Id.* Substantial evidence is that which is of sufficient force and character that it will, with reasonable

certainty, compel a conclusion one way or the other, without resorting to speculation or conjecture. *Dortch v. State*, 2018 Ark. 135, at 5, 544 S.W.3d 518, 522. This court does not weigh the evidence presented at trial or assess the credibility of the witnesses, because those are matters for the fact-finder. *Drennan v. State*, 2018 Ark. 328, at 6, 559 S.W.3d 262, 266. The trier of fact is free to believe all or part of any witness's testimony and may resolve questions of conflicting testimony and inconsistent evidence. *Id.* Further, circumstantial evidence may provide a basis to support a conviction, but it must be consistent with the defendant's guilt and inconsistent with any other reasonable conclusion. *Edmond*, 351 Ark. 495, 95 S.W.3d 789. Whether the evidence excludes every other hypothesis is left to the jury to decide. *Carmichael v. State*, 340 Ark. 598, 12 S.W.3d 225 (2000).

With these standards in mind, we turn to Davis's first point on appeal. Davis was convicted of capital murder. A person commits capital murder if, "[w]ith the premeditated and deliberated purpose of causing the death of another person, the person causes the death of any person[.]" Ark. Code Ann. § 5-10-101(a)(4) (Supp. 2019). Premeditated and deliberated murder occurs when the killer's conscious object is to cause death, and he forms that intention before he acts and as a result of a weighing of the consequences of his course of conduct. *Carmichael*, 340 Ark. at 602, 12 S.W.3d at 228. Premeditation is not required to exist for a particular length of time. *Id.* It may be formed in an instant and is rarely capable of proof by direct evidence but must usually be inferred from the circumstances of the crime. *Id.* A jury can infer premeditation and deliberation from circumstantial evidence, such as the type and character of the weapon used; the nature, extent, and location of wounds inflicted; and the conduct of the accused. *Brooks v. State*, 2016 Ark. 305, at 6, 498 S.W.3d

9

292, 296. "Causation may be found when the result would not have occurred but for the conduct of the defendant operating either alone or concurrently with another cause unless: (1) [t]he concurrent cause was clearly sufficient to produce the result; and (2) [t]he conduct of the defendant was clearly insufficient to produce the result." Ark. Code Ann. § 5-2-205 (Repl. 2013).

Davis's primary challenge to the sufficiency of the evidence supporting her capital-murder conviction focuses on an alleged lack of evidence that she is the person that committed the offense. Davis's argument hinges largely on Brazell's credibility versus that of Breedlove's. Davis contends that both she and Breedlove implicated Brazell in the shooting and that Brazell's changing story and criminal history supported their testimony that he was the shooter. Although Davis acknowledges that Breedlove similarly has a criminal history, she argues that it does not resemble the allegedly aggressive and violent pattern of Brazell's past. The State responds that substantial evidence supports Davis's conviction and that the conflicting trial testimony does not necessitate a finding to the contrary because the jury was free to believe Brazell's version of events.

Here, trial testimony established that Davis had been arguing with Kendal on the day of the shooting because he had allegedly struck her fourteen-year-old son earlier that same day. Video-surveillance footage from the Superstop depicted the Jeep Patriot that Davis, Breedlove, and Brazell were riding in quickly approach Kendal's vehicle from behind as he turned onto Hazel Street. The footage showed Davis hanging out of the window of the Jeep waving her arm up and down in Kendal's direction only a few minutes before the shooting was thought to have taken place, roughly one block away from the gas station.

10

Brazell testified that Davis was waving a handgun outside the window in an attempt to get Kendal to pull his vehicle over. Davis admitted that she and Kendal had engaged in a heated argument involving the incident with her teenage son once both vehicles had pulled over on 33rd Avenue, just before the shooting, and that she had brandished a gun during this argument. Detective Rucker testified that he discovered a Ruger .380-caliber handgun, which was later determined to be the murder weapon, during the May 6 traffic stop after Davis handed the bag containing the gun to Heard and said, "[H]old on to this." Davis had recently borrowed this gun from Heard.

Despite Davis's arguments urging us to reweigh the evidence, we must determine whether substantial evidence exists to support her conviction. As stated above, we have long held that the credibility of witnesses is an issue for the jury, and this court will not second-guess the credibility determinations made by the fact-finder. *See Conte v. State*, 2015 Ark. 220, at 15–16, 463 S.W.3d 686, 696. The jury is free to believe all or part of any witness's testimony, to resolve questions of conflicting testimony and inconsistent evidence, and to believe the State's version of the facts rather than the defendant's. *Id.* at 16, 463 S.W.3d at 696. Additionally, we have explained that "[o]n appeal, we will disregard testimony that the jury has found to be credible only if it is so inherently improbable, physically impossible, or so clearly unbelievable that reasonable minds could not differ about it . . . [and] inconsistent testimony does not render proof insufficient as a matter of law." *Id.*, 463 S.W.3d at 696–97 (internal citations omitted). Thus, when considering the preceding facts and circumstances in the light most favorable to the State, we find that there was substantial evidence to support Davis's capital-murder conviction.

## B. Juror Misconduct

For her second point on appeal, Davis contends that the circuit court erred in denying her motion for new trial on the basis of juror misconduct. The decision whether to grant a new trial is left to the sound discretion of the circuit court, and it is not reversed in the absence of an abuse of discretion or manifest prejudice to the complaining party. *Johnson v. State*, 2017 Ark. 106, 2, 515 S.W.3d 116, 117. Abuse of discretion is a high threshold that does not simply require error in the circuit court's decision but requires that the circuit court act improvidently, thoughtlessly, or without due consideration. *Arnold v. State*, 2022 Ark. 191, at 7, 653 S.W.3d 781, 787. A circuit court's factual determination on a motion for a new trial will not be reversed unless clearly erroneous. *Johnson*, 2017 Ark. 106, at 3, 515 S.W.3d at 117. A finding is clearly erroneous, even if there is evidence to support it, when the appellate court, after review of the entire evidence, is left with the definite and firm conviction that a mistake has been made. *Dortch v. State*, 2018 Ark. 135, at 12, 544 S.W.3d 518, 525. The circuit court determines issues of credibility. *Taffner v. State*, 2018 Ark. 99, at 14, 541 S.W.3d 430, 438.

Relying on *Hot Springs Street Railway Co. v. Adams*, 216 Ark. 506, 226 S.W.2d 354 (1950), Davis alleges that Bradley's deliberate failure to disclose her familiarity with Bloodman denied her the right to a fair and impartial jury. Davis contends that Bradley's lack of candor denied Bloodman the opportunity to conduct further questioning to determine whether Bradley should have been struck from the jury for cause. Davis argues that Bradley's failure to disclose that her sister worked for Bloodman was obviously prejudicial because, if not for this failure, Bradley would not have been on the jury and

there is a reasonable probability of a different outcome. The State responds that Davis did not present any evidence that Bradley and Bloodman knew each other, that Bradley knew that Jones worked for Bloodman, or that Bradley had been dishonest about her lack of familiarity with the attorneys in Davis's case either in completing her juror questionnaire or during voir dire.

We have held that "[t]he party moving for a new trial bears the burden of proving, first, that juror misconduct occurred, and second, that there was a reasonable probability of resulting prejudice. The court does not presume prejudice but rather presumes that jurors are unbiased and qualified to serve, and the appellant has the burden to show otherwise." *Taffner*, 2018 Ark. 99, at 14, 541 S.W.3d at 438 (internal citations omitted).

We are not persuaded by Davis's reliance on *Adams*, *supra*. In *Adams*, we reversed and remanded the circuit court's denial of a mistrial motion because, while the jury was deliberating, the appellant's counsel learned that a juror was currently represented in a pending suit by one of the appellees' attorneys and had not disclosed that relationship during voir dire despite having been specifically questioned about it. *Adams*, 216 Ark. at 508, 226 S.W.2d at 355. We held that "[t]he appellant was entitled to the information sought, as a basis for a peremptory challenge if not as a ground for challenging for cause . . . [and] [t]he very theory of an impartial jury trial demands that the juror take positive action to bring his possible disqualification out into the open when the question is raised." *Id*. In *Adams*, unlike in the case before us, we were faced with a situation wherein a juror had an ongoing professional relationship with one of the attorneys involved in the case, and when asked

13

whether he had been represented by any of the attorneys, he failed to make the appropriate disclosure. Such is not the case here. Accordingly, *Adams* is not instructive.

Here, the issue is whether Bradley engaged in juror misconduct by failing to disclose that her sister was employed by Davis's defense attorney, and if so, whether there was a reasonable probability of resulting prejudice. During voir dire, Bradley was questioned about her familiarity with the attorneys involved in Davis's case, but a review of the record demonstrates that she was not at any point asked whether any of her relatives were employed by the attorneys. Consistent with her answers to the juror questionnaire, Bradley indicated that she was not familiar with the attorneys involved in Davis's case, including Bloodman. There is no evidence that Bradley and Bloodman knew each other, and Davis has failed to provide any evidence that Bradley was dishonest in the jury-selection process or engaged in any misconduct. Bloodman's testimony during the July 24 hearing—that he did not know Bradley—corroborated Bradley's answers in her juror questionnaire and during voir dire. Further, Jones's testimony from that hearing demonstrated that Bradley did not inform Jones of her service as a juror in Davis's trial until after the trial had concluded, and that the extent of their conversation was limited to the fact that Bradley had served on the jury. Based on the foregoing, Davis has failed to demonstrate that Bradley engaged in juror misconduct. Accordingly, we conclude that the circuit court did not abuse its discretion by denying Davis's motion for a new trial.

III. *Rule 4-3(a) Review*

Pursuant to Arkansas Supreme Court Rule 4–3(a), the record has been reviewed for all objections, motions, and requests that were decided adversely to Davis, and no prejudicial error was found.

Affirmed.

*Sharon Kiel*, for appellant.

*Tim Griffin*, Att'y Gen., by: *A. Evangeline Bacon*, Ass't Att'y Gen., for appellee.